COMMONWEALTH *vs.* JAMES HALEY.

Suffolk.   February 5, 1973. — May 3, 1973.

Present: TAURO, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Practice, Criminal,* Fair trial, Exclusion of evidence by judge on his own motion, Questioning of witness by judge, Admonition of counsel by judge, Unsworn statement by defendant. *Evidence,* Relevancy and materiality, On cross-examination, Inflammatory evidence.

A judge may exclude evidence on his own motion, and where he shows no bias in doing so, his action is to be reviewed by the same standard as applies on exclusion of evidence on objection. [516–519]

The judge at a murder trial did not conduct a biased examination of two witnesses by asking one questions clarifying a possible inconsistency in her testimony and the other questions testing her recollection of details. [519–520]

The defendant in a murder case was not deprived of a fair trial by the cumulative effect of tension between the judge and defence counsel nor by a sarcastic remark made by the judge to defence counsel in the jury's presence where it appeared that the tension was created by defence counsel, that counsel was not intimidated by it and took numerous exceptions, that the judge did not play

a partisan role, and that the judge instructed the jury not to be influenced by what they might think his opinion to be. [520–522]

At the trial of a murder indictment, no error was shown in action by the judge excluding on his own motion a question to a witness seeking to establish the possibility of discord between the victim and the witness by reason of the witness's having gone out with a third person about two years before the murder. [523]

At the trial of an indictment for murder, there was no error in excluding a question to a witness intended to throw suspicion on someone other than the defendant where defence counsel was not prepared to offer any supporting evidence as a basis for the question. [523]

At the trial of a murder indictment, there was no error in the admission of evidence of an assault and battery, committed by the defendant on his wife about two months before the murder, to show the intensity of relevant discord between them. [523–524]

It was not required at a murder trial that the defendant be allowed to make an unsworn statement to the jury. [524]

INDICTMENT found and returned in the Superior Court on September 13, 1971.

The case was tried before *Roy, J.*

*Alfred P. Farese* for the defendant.

*Gerald F. Muldoon,* Assistant District Attorney (*Elizabeth C. Casey* with him) for the Commonwealth.

BRAUCHER, J.   On September 13, 1971, the defendant was indicted for a murder committed on July 11, 1971. On March 3, 1972, after five days of trial, the jury returned a verdict of guilty of murder in the first degree and recommended that the penalty of death be not imposed.   The same day the defendant was sentenced to life imprisonment.   The case is before us pursuant to G. L. c. 278, §§ 33A–33G.   The defendant took exceptions to the denial before trial of three motions made by him, and took 134 exceptions at trial.   He filed twenty assignments of error, and argues eight of them in his brief.

We summarize the evidence.   The victim, David Myers, was a man twenty-five years old, five feet seven inches tall, and weighed 230 pounds.   He lived in a ground-floor apartment in Dorchester with Gloria Custis and their six months old baby.   The defendant, James Haley, was about the same height as the victim, but much slim-

mer, weighing about 120 pounds. His wife Brenda is Gloria's sister, and the defendant and Brenda lived in the apartment for about a month in March, 1971. On May 3, 1971, the defendant struck Brenda and threatened her, and the same day she went to her parents' home in Delaware. She came back to Boston for about a week in June, but did not see the defendant. She came back again on July 9, and spoke to the defendant on the telephone. On Saturday, July 10, while Brenda and Gloria were on their way to Gloria's apartment, they saw the defendant about thirty-five feet away and he looked at them, but there was no conversation with him. Brenda and Gloria then went to Gloria's apartment, although Brenda was staying with a third sister at a different address.

On the same Saturday Gloria and the victim went to bed in their apartment between 10 and 10:30 P.M. The doors were locked, but a kitchen window was open. In the early morning of July 11, she awoke, heard their dog barking, and saw the victim going toward the kitchen. She said, "What's the matter, David?" He said, "James stabbed me. James stabbed me." As she was getting up from the bed, she heard a gunshot, and as she was running toward the kitchen, David said, "Why did you stab me, man? Brenda's not here." Gloria then looked into the bathroom, where the light was on, and saw the defendant and the victim struggling over the tub. The defendant had a small gun and a large knife in his hands, and the victim had his hands over the defendant's hands, trying to get the knife and gun away from him.

The telephone in the apartment was disconnected, and Gloria thought that the telephone in the upstairs apartment of a neighbor was also disconnected. She grabbed her clothes, ran out the door and yelled for help. She ran a block and a half or two blocks to her brother's apartment, arriving fifteen or twenty minutes after 5 A.M. The police were called. With her brother and two others, she returned to her apartment, met the police there, and

let them in. The victim was lying on the floor. He was taken to a hospital and pronounced dead at 5:45 A.M. The cause of death was a bullet wound in the head. He had been stabbed first. A bullet removed from the victim's head and two spent bullets found in the apartment had been fired from the same gun.

The defendant worked at the Massachusetts Institute of Technology on Saturday, July 10, until 2:45 P.M. Later he visited his mother at the hospital. Still later, in the evening, he was at a party in Dorchester. He left with others to get sandwiches about 3 A.M. and returned about 4 A.M. The defendant's sister, who was at the party, testified that she saw the defendant about 5 to 6 A.M., when the crime apparently occurred.

The defendant contends that he was denied the fair trial guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States because the trial judge (1) improperly excluded evidence not objected to by the Commonwealth, (2) improperly cross-examined Gloria Custis and the defendant's sister, and (3) improperly admonished defence counsel in the presence of the jury. He also contends that there were two errors in the exclusion of evidence sought by the defendant on cross-examination, two errors in the admission of irrelevant and inflammatory evidence presented by the prosecution, and error in the denial of the defendant's motion to make an unsworn statement to the jury.

1. *Exclusion of evidence on the judge's own motion.* Some eighteen times during the cross-examination of prosecution witnesses by counsel for the defendant, the judge excluded questions on his own motion, without objection by the prosecution, and the defendant excepted. Several of the questions are characterized by the defendant himself as "marginally material," "leading," or "argumentative"; others seem largely rhetorical or repetitious. Still others might have been material if connected up, and were excluded only after the judge had asked whether counsel was prepared to make the necessary showing and after counsel had indicated that he was

not.  See *Commonwealth* v. *Geagan,* 339 Mass. 487, 509–510.

Thus police witnesses were asked whether particular facts were significant or important.  Gloria was asked whether she was "surprised" at one point, whether she was "worried" at another, whether she knew the defendant's mother was in the hospital, and whether she knew why the victim said, "Brenda is not here."  As to some of the questions, it seems to be conceded that exclusion would have been proper if the prosecution had objected.  Answers to some might have been relevant to the bias of the witness, but rulings excluding them after objection would not be disturbed unless the substantial rights of the defendant were clearly shown to have been prejudiced.  *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 590.  *Commonwealth* v. *Greenberg,* 339 Mass. 557, 580–582.  *Commonwealth* v. *Nasser,* 351 Mass. 37, 43–44.  Other questions, as to which specific prejudice is claimed, are discussed further below.

As the defendant contends, failure to object to offered evidence operates to waive objections to its admissibility.  *Boyle* v. *Columbian Fire Proofing Co.* 182 Mass. 93, 99.  *Commonwealth* v. *Geagan,* 339 Mass. 487, 513.  Such evidence may then be given its probative force by the trier of fact.  *O'Kane* v. *Travelers Ins. Co.* 337 Mass. 182, 184.  *Reagan* v. *John J. Amara & Sons Co.* 348 Mass. 734, 737.  It is contended, therefore, that the judge has no authority to exclude even inadmissible evidence unless it is objected to.  Alternatively, it is contended that the authority to exclude without objection is limited to evidence "wholly incompetent or inadmissible for any purpose."  See *South Atl. S.S. Co. of Del.* v. *Munkacsy,* 37 Del. 580, 594–595; *Rabun* v. *Wynn,* 209 Ga. 80, 82–83; *Lambert* v. *Rodier,* 194 S. W. 2d 934, 937 (Ct. App. Mo.) ; *Drescher* v. *Granite State Mach. Co.* 96 N. H. 508, 511–512.  Action by the judge on his own motion, it is said, put him in the position of an advocate for the Commonwealth, prejudiced the jury against the defendant, and deprived him of a fair trial.

We hold that the judge may of his own motion deal
with offered evidence.  See Wigmore, Evidence (3d ed.)
§ 18; McCormick, evidence (2d ed.) § 55.  "There cer-
tainly must be some limit beyond which parties cannot
be permitted to go, in extending issues of fact and bring-
ing into a case matters which have no essential bearing
on its real merits." *Mowry* v. *Smith,* 9 Allen 67, 68.
"There are numerous cases where it has been held per-
missible for a trial judge to exclude from consideration
evidence erroneously admitted over objection. . . . A
party who succeeds in introducing incompetent evidence
has no right to insist that it remain in the case.  The
trial judge may reconsider its admission and strike it out,
provided no hardship befalls the party introducing it.
*Crowley* v. *Swanson,* 283 Mass. 82, 85." *Walsh* v. *Dis-
trict Court of Springfield,* 297 Mass. 472, 478.  Equally
he may exclude it without waiting for an objection by
counsel. *Chicago & N. W. Ry.* v. *Kelly,* 84 F. 2d 569, 572–
573 (8th Cir.).  *Alquero* v. *Duenas,* 319 F. 2d 40, 42
(9th Cir.).  *O'Kelley-Eccles Co.* v. *State,* 160 Cal.
App. 2d 60, 65.  *Greer* v. *Whittington,* 251 N. C. 630,
634–635.

"A good judge must have firmness.  Sitting with a
jury, he should so conduct the trial that the case will go
to the jury, so far as his lawful powers permit, free
from irrelevant considerations and appeals to prejudice
and emotion.  As a former justice of our court once said,
'The judge who discharges the functions of his office is
. . . the directing and controlling mind at the trial, and
not a mere functionary to preserve order and lend cere-
monial dignity to the proceedings.' *  It is true, now as
in Lord Bacon's day, that 'an overspeaking judge is no
well-tuned cymbal,' and that 'It is no grace to a judge

---

* "Braley, J., in *Whitney* v. *Wellesley & Boston Street Railway,* 197
Mass. 495, 502. On the contrary, Dean Pound says of the situation
in many states: 'So far as our trial courts are concerned, the judge
is very like the wooden Indian that used to stand out in front of the
old-time tobacco shop — dignified, imposing, mysterious and strictly
ornamental.' 'The Judcial Office in America,' 10 Boston U. S. Rev.
125, 127 (April, 1930)."

first to find that which he might have heard in due time from the bar.' ** A judge who takes a case that he does not understand out of the hands of competent counsel who do understand it, is a nuisance. The judge must never become or appear to be a partisan.

"But a judge need take no vow of silence. He is there to see that justice is done, or at least to see that the jury have a fair chance to do justice. . . . The judge ought not to let the jury be diverted from the real issue. The skill of counsel must not be allowed to mislead the jury by raising false issues or by appeals to emotion and prejudice. . . . It is not always easy for a judge to see his duty clearly. But a first-rate trial judge will find and tread the narrow path that lies between meddlesomeness on the one hand and ineffectiveness and impotence on the other." Lummus, The Trial Judge, 19–21 (1937). See *Goldman* v. *Ashkins,* 266 Mass. 374, 379–380; A. B. A. Standards Relating to The Function of the Trial Judge (Approved Draft, 1972) 3–4, 25–27, 66–71, 81–82. The judge's lawful powers are plenary. G. L. c. 212, § 6; c. 278, § 11. *Commonwealth* v. *Parrotta,* 316 Mass. 307, 310. The standard of review is the same whether evidence is excluded on objection or on the judge's own motion, unless the judge exhibits bias in acting on his own motion. See *Commonwealth* v. *Fleming,* 360 Mass. 404, 409. No bias was exhibited, and there was no abuse of the judge's discretion.

2. *Cross-examination by the judge.* The defendant contends that the judge conducted a biased examination of two witnesses. First, after Gloria had testified that the defendant had a gun and a knife in his hands while he was struggling with the victim in the bathroom, she stated on redirect examination that she saw the defendant's "face and part of the upper part of his body." Thereafter she answered in the affirmative when defence counsel asked, "You saw nothing else" except the face and upper part of his body, "is that right?" The judge

---

** "Bacon's Essays, 'Of Judicature.' "

then asked, "Did you see his arms?" and she answered, "Yes." Second, after the examination and cross-examination of the defendant's sister, the judge asked her a series of questions about drinking at the party and about the precise time when she last saw the defendant on the morning of the crime.

The judge could properly interrogate witnesses. *Commonwealth* v. *Oates*, 327 Mass. 497, 500. *Commonwealth* v. *Freeman*, 352 Mass. 556, 560. *Commonwealth* v. *Fleming*, 360 Mass. 404, 409. There was no indication of bias. The question asked of Gloria simply cleared up what might have been misread as an inconsistency in her testimony. The questions asked of the defendant's sister tested her recollection of details and produced the most impressive alibi evidence given at the trial. There was no error in the judge's questioning.

3. *Admonitions to counsel.* Defence counsel, on direct examination, asked the defendant's sister whether the defendant told her where he was going after he arose on Sunday morning. On objection, the judge excluded the question, and the defendant excepted. In a brief colloquy which followed, the judge asking counsel why he was taking an exception, said, "It's clear that this is hearsay and inadmissible," and then asked, "You say I'm wrong?" Counsel said he didn't say the judge was wrong but "I disagree with your ruling." The judge said, "I'm right, but you disagree, is that right?" He then told counsel to proceed and refused to let him make an offer of proof.

We need not decide whether the question was proper to corroborate other evidence that the defendant went to play basketball. See McCormick, Evidence (2d ed.) § 295. Compare *Commonwealth* v. *Fatalo*, 345 Mass. 85, 86–88, with *Commonwealth* v. *DelValle*, 351 Mass. 489, 491–493. Whether the defendant played basketball a few hours after the crime was not highly material, and another witness later testified that the defendant played basketball Sunday morning. Error is now claimed, not because the question was excluded, but because the judge "admonished defence counsel in front of the jury."

A judge may warn or rebuke counsel in a proper case. *Reid* v. *Hathaway Bakeries, Inc.* 333 Mass. 485, 487–488. *Commonwealth* v. *Lewis,* 346 Mass. 373, 378–379. "Generally, of course, it is the better practice to warn and rebuke counsel out of the jury's hearing." *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 227. *Commonwealth* v. *Leonard,* 352 Mass. 636, 641–642. The colloquy now complained of savors of sarcasm, it was not unavoidably made in the jury's presence, and it did not help to expedite the trial or to avoid confusion. But the defendant's characterization of it as a "stern reprimand" seems overdrawn. If, as seems likely, the judge was hesitating while he considered whether one of the numerous exceptions to the hearsay rule might be applicable, counsel offered no help. Even if the judge was wrong in his application of the rule, we do not think the matter rose to the level of warning or reproof, much less prejudicial error.

The defendant characterizes the judge's remarks as "far from courteous and uncontroversial," and claims that they "put counsel in the precarious position of fearing to except to the court's ruling." The transcript of course does not disclose the manner or tone of counsel or judge, although it does show that counsel was able to overcome any fear of taking exceptions. Error cannot be based on mere assertion or speculation, but we have reviewed the transcript closely to ascertain whether the judge's actions might have deprived the defendant of a fair trial through the cumulative effect of tension between court and defence counsel. Compare *Commonwealth* v. *Lewis,* 346 Mass. 373, 378.

There were numerous comments and suggestions by defence counsel, unsupported by anything in the testimony, and a very considerable number of argumentative, rhetorical, repetitive and inconsequential questions. The judge intervened a number of times to try to eliminate unsupported assumptions, to elicit facts rather than adjectival characterizations, or to prevent repetition or confusion. The judge's problem may be illustrated by a

sequence of events not made the subject of exception or argument on this appeal. In the cross-examination of Gloria, with respect to both important and unimportant facts, defence counsel asked at least eleven times the question, "No question in your mind about that?" or the like. The next witness, Brenda, testified on cross-examination that on the afternoon of July 10 she and Gloria had been together, "Just about all day." When counsel asked, "No question about that, is there?" the judge quoted the answer of the witness, and when counsel pursued the point the judge asked him to lower his voice. Cross-examining the next witness about events after the crime, defence counsel asked, "No question in your mind about that?" for the fourth time, and the judge said, "You needn't ask that question again. . . . You're just enlarging the record here . . .." Shortly thereafter counsel again asked the question, and the judge said, "Why do you say that, 'No question about that?' . . . There's no reason for it." After counsel had asked such questions several more times, the judge said, "I object very much to your repeating that 'No question about that.' It's not relevant and it's not proper cross examination and please don't do it again." To each of these comments by the judge, counsel replied, "All right," but he asked the same question several more times in the direct examination of defence witnesses, with no comment from the judge.

These colloquies and others do reveal a certain tension between counsel and judge, but they also show that counsel created the problem. They do not show counsel terrified, nor do they show the judge playing a partisan or overzealous role or expressing his opinion on the facts or departing from standards of courtesy and dignity. The judge fully instructed the jury that his rulings, comments and questions were not to be taken as indicating his opinion on issues of fact, and that they were to decide such issues without being influenced by what they might think his opinion to be. We conclude that the judge's actions did not deny the defendant a fair trial.

4. *Exclusion of evidence.* The defendant claims error in the exclusion, on the judge's own motion, of three questions asked of Gloria on cross-examination. She testified that she knew well one Alex Corbin, not otherwise identified, and was not going out with him in July, 1971. The judge excluded the question whether she had ever gone out with Corbin, but only after she had answered, "Yes." In response to a question by the judge, she testified that she had last gone out with Corbin in 1969. The judge then excluded the question whether that was after she was going with the victim. It is now contended that the answer might have disclosed discord between Gloria and the victim, but it seems plain that any relationship between Corbin and Gloria was too remote in time. *Commonwealth* v. *Murphy,* 282 Mass. 593, 597–598. *Commonwealth* v. *Burke,* 339 Mass. 521, 534.

Gloria had testified on direct examination that on the morning of the crime she had gone to her brother's apartment and had returned to her own apartment with her brother, a woman and one Milton Allston. On cross-examination she testified that Allston had spent the night at her brother's house and that she had never gone out with him. Counsel then asked, "And, of course, he wasn't at your house at all that morning?" The judge asked whether counsel was "prepared to show that by evidence," counsel said he didn't know, and the judge excluded the question. Like the Corbin questions, this question was an attempt to throw suspicion on someone other than the defendant. Without some supporting evidence, it invited unwarranted speculation. See *Commonwealth* v. *Geagan,* 339 Mass. 487, 509–510.

5. *Admission of inflammatory evidence.* The defendant objected to testimony by Brenda as to why she left the defendant, her husband, about two months before the crime. She testified that they had an argument, and that he hit her and cut her over the eye, and another witness testified that she saw Brenda the same day and that Brenda had a scar over her eye and was bleeding. The judge ruled that this evidence had some relevance

to the defendant's intention, if the jury found that he entered the victim's house on the night of the crime. The defendant contends that the evidence of an independent crime of assault and battery was irrelevant and inflammatory, citing *Commonwealth* v. *Banuchi,* 335 Mass. 649, 654, and *Commonwealth* v. *Welcome,* 348 Mass. 68, 70–71. We think the judge was right. The evidence was not offered to show the bad character of the defendant but to show the intensity of the discord between him and his wife. It was adequately connected with the crime by evidence of intervening events and by eyewitness testimony to the defendant's presence at the scene of the crime. In these circumstances because its inflammatory nature did not outweigh its probative value, the evidence is admissible. *Commonwealth* v. *Stirling,* 351 Mass. 68, 71–72. *Commonwealth* v. *Ross,* 361 Mass. 665, 679–680. *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 815–816.

6. Permitting an unsworn statement is not now required. *Commonwealth* v. *O'Brien,* 360 Mass. 42, 50.

7. We have carefully reviewed the evidence as required by G. L. c. 278, § 33E, as amended. It was open to the jury to return the verdict which they did, and justice does not require the entry of a verdict of a lesser degree of guilt than that returned by the jury or that there be a new trial.

*Judgment affirmed.*