## Commonwealth vs. David G. Magraw.

Norfolk. October 7, 1997. - February 4, 1998.

Present: Wilkins, C.J., Lynch, Greaney, Marshall, & Ireland, JJ.

*Evidence,* Hearsay, State of mind, Motive, Relevancy and materiality, Prior misconduct. *Homicide.*

Discussion of the admissibility of evidence at a murder trial relative to the victim's state of mind. [594-595]

At a murder trial in which the defendant contended that he and the alleged victim, his wife, got along well and that she had agreed to meet him alone in her house, the judge correctly admitted evidence of the victim's state of mind that contradicted the defendant's contentions [595-596]; however, other evidence of the victim's concern that something would happen to her and be made to look like an accident was not probative and was prejudicial to the defendant's case [596-597].

At a murder trial, statements of the victim to the effect that the defendant, her husband, had sought to reconcile with her and that she refused were improperly admitted as reflective of the defendant's motive (state of mind), where there was no independent evidence that the defendant had actually attempted to reconcile. [597-598]

At a murder trial in which the defendant's estranged wife was the victim, evidence of the defendant's extramarital affairs was not relevant or probative, and the judge should have excluded it. [598-599]

At a murder trial, evidence that the victim found a rifle belonging to the defendant, her husband, lying on her bed was properly admissible to show the discord between the defendant and the victim and to rebut the defendant's claim that he and the victim were happy together. [599]

At a murder trial in which the evidence against the defendant was mostly circumstantial, certain evidence, erroneously admitted, was prejudicial to the defendant's case and he was entitled to a new trial. [600]

Indictment found and returned in the Superior Court Department on April 26, 1994.

The case was tried before *Suzanne DelVecchio,* J.

*James L. Sultan (Charles W. Rankin, J.W. Carney, Jr., & Andrew M. D'Angelo,* with him) for the defendant.

*Stephanie Martin Glennon,* Assistant District Attorney, for the Commonwealth.

Ireland, J. A jury convicted the defendant of murder in the first degree with extreme atrocity or cruelty for killing his wife

Nancy. The defendant argues that certain hearsay evidence regarding the alleged victim's state of mind was improperly admitted such that his Federal and State constitutional rights to confrontation and due process were violated. Because we conclude that there were several evidentiary errors which were prejudicial to the defendant's case, we do not reach any constitutional issue. Therefore, we reverse and remand for a new trial. Because there will be a new trial, we comment briefly on the admissibility of other evidence which the defendant claims was improperly admitted.

We summarize the evidence. The defendant and the alleged victim (victim) were married in June, 1974. In early 1989, the couple began discussing a divorce. Sometime in the fall of 1989, both hired attorneys and began negotiating the possible terms of a divorce settlement.

Evidence appears from a February, 1990, meeting between the two and their attorneys that the defendant was angry about having to divide marital assets that he viewed as his own.[1] Nevertheless, another meeting was scheduled for July 23, 1990, between the victim, defendant, and their attorneys to discuss further the disposition of the marital assets.

When the victim failed to arrive at the July 23 meeting, her attorney sought to reach her by telephone a number of times. Although unable to reach her, the attorney proceeded with the meeting in her absence, because he knew the details of the settlement that the victim wished to obtain. During the meeting, the defendant mentioned that he had been to the victim's home that morning and knew that the victim was aware of the meeting.

Shortly after 3 P.M., the victim's attorney again tried to reach her. This time one of her sons answered the telephone. He seemed out of breath and stated that he had just arrived home. When the attorney asked to speak to the victim, her son responded that he would look for her. He returned to the telephone, saying very excitedly that he had to hang up and call his father. The attorney

---

[1]At the February, 1990, meeting, after the victim's attorney told the defendant that a fifty-fifty division of assets was appropriate, the defendant became agitated and told the victim that, because she was trained as a teacher, she could either get a teaching job or live with her parents. He argued that the marital assets were the exclusive fruits of his labor, and that the victim had been compensated enough during the marriage by having a roof over her head, meals, and clothing. He offered to give her "ten grand." Noting that they would not make any more progress at this meeting, the parties agreed to meet on July 23, 1990, to discuss the settlement further.

handed the phone to the defendant who spoke briefly to his son. After hanging up, the defendant said, "She's dead. She's gone."

The attorneys and the defendant drove to the victim's house. When they arrived, the defendant entered the house. While the victim's attorney was still outside, the defendant walked out of the house and said, "We were so happy." He remarked, "She was depressed. She was, she was on pills." The defendant also stated that the victim had been seeing a psychiatrist and then went back inside the house.

. The victim's son had found her body lying face down in the living room on the edge of some tiles next to a wood-burning stove. The defendant stayed in the kitchen, and did not go into the living room to see the victim's body. An emergency medical technician who arrived at the scene moments later observed that the victim had abrasions on her hands and face and that rigor mortis had set in. The Walpole police who also arrived on the scene noted no sign of a struggle or a forced entry.[2]

At some point, the police began to question the defendant. After waiving his Miranda rights, the defendant told a police officer, among other things, that he had gone to the victim's house that morning because the two had agreed to write a joint letter to their son who was at camp. He also told the officer about a recent incident with his wife relative to some rifles. The defendant stated that he had owned two .22 caliber rifles and that he had left one of them lying on a bed in the house — a gesture the victim took as a threat. He told the officer that he had left the gun on the bed because he hoped that his wife would think he was contemplating suicide and would therefore take pity on him.

Considerable evidence was introduced at trial that, in the months leading up to her death, the victim had made various statements to family members, friends, her attorney, and her psychiatrist that she feared the defendant and was concerned about the custody of their youngest son, John. Most of that

---

[2]At trial, the Commonwealth presented evidence that the victim died of manual asphyxiation or strangulation. Death would have been caused by sustained pressure on the victim's neck for three to five minutes. The defendant claimed that the victim died from myocarditis (an inflammation of the heart muscle) from which she suffered, and that the external injuries had resulted from her falling onto the tiles next to the wood-burning stove. Although the defendant presented testimony that myocarditis could result in asphyxiation, the pathologist who performed the autopsy claimed that the various wounds could only have resulted from more than one application of trauma to the victim's body, and not, as the defendant suggested, from a single event like a fall.

evidence was introduced by the Commonwealth over the defendant's objection.[3] For example, the victim's brother testified that the victim had told him in early 1990 that "a number of things had occurred which made her very frightened." According to her brother, "[s]he would wake up in the middle of the night and [would] occasionally find her husband in the bedroom . . . He would arrive at the house at strange times unannounced." She also told her brother, according to his testimony, that she was afraid something was going to happen to her. When he suggested that she obtain a protective order against the defendant she told her brother, "I am afraid that if I got a court order I would inflame [the defendant]. I don't want to do anything that will inflame my husband." She also sent a letter to her brother in which she expressed her concern about who would have custody of her son John, "if something were to happen to me."

The victim also wrote to her attorney that she did not want to be alone with the defendant in her house. She wrote that "the Stuart case has set me to thinking about what would happen to [my son] if something happened to me."[4] Likewise, the victim expressed concerns, both to her psychiatrist and to a close friend, that she was afraid that the defendant would hit her. She also told a friend that she did not want to ride in a car with the defendant unless she was driving. Finally, the victim told a number of family members that the defendant had tried to reconcile with her, but that she had refused his offer because she viewed this merely as an attempt by him to retain his property.

The judge had excluded certain portions of the psychiatrist's testimony. During direct examination, the defendant expressed

---

[3]Defense counsel attempted to prevent evidence of the victim's state of mind from being admitted by filing several motions in limine, by making a "continuing objection" to the admission of the evidence, and by offering to stipulate that the victim feared the defendant. Nevertheless, the judge indicated that she would admit testimony of the victim's "fear" of the defendant. Apparently, as a strategy to blunt the impact of the evidence, defense counsel tried to depict the victim as a generally fearful person by bringing in even more evidence of the victim's fear, including a reference to "the Stuart case." The murder of Carol Stuart in October, 1989, generated widespread publicity. Her husband, Charles Stuart, had claimed that a black mugger attacked and then shot them. When the police implicated Charles in the death of his wife, he committed suicide by jumping from the Tobin Bridge. See *Matter of a John Doe Grand Jury Investigation*, 410 Mass. 596, 597 (1991), for a discussion of the incident.

[4]Apparently, as a strategy, after the judge indicated she would admit the testimony on the victim's "fear" of the defendant, much of that evidence was introduced by the defense attorney, including the reference to "the Stuart case."

concern that the psychiatrist might testify to something that had been explicitly excluded by the judge. The judge then permitted a brief recess so that the prosecutor could warn the psychiatrist not to say anything about the excluded evidence. One excluded piece was the victim's statement to the psychiatrist that she feared that the defendant was going to murder her and make it look like an accident.

During direct examination the psychiatrist did not testify as to any of the excluded evidence. However, during cross-examination, the following colloquy occurred:

> COUNSEL FOR THE DEFENDANT: "And [the victim] told you that she was afraid that [the defendant] would hit her even though he had never hit her before?"
>
> THE WITNESS: "There is no, I don't see anything about him hitting her. She was afraid that something would happen to her."
>
> COUNSEL FOR THE DEFENDANT: "Even though he had never hit her in the past. Is that true?"
>
> THE WITNESS: "She did not say she was afraid he would hit her. She was afraid she would accidentally be found dead."

The psychiatrist referred to that conversation with the victim in violation of instructions that the district attorney had given or should have given her at the direction of the judge. Thereafter, the judge allowed the Commonwealth to expound on the witness's improper response to the defendant's question during redirect examination based on her determination that the defendant had opened the door to this issue. The defendant objected, rightly claiming that he had not opened the door.

The judge admitted these statements under the state of mind exception to the hearsay rule, concluding that they were relevant to the defendant's motive. These hearsay statements were admitted for the limited purpose of showing the victim's state of mind on the basis that they were relevant to the defendant's motive to kill her, and the judge instructed the jury accordingly.

A. *Evidence Regarding the Victim's State of Mind.*

The defendant argues that, because the victim's out-of-court statements were improperly admitted under the state of mind rubric, he is entitled to a new trial. He contends that the improper admission of these statements prevented him from confronting a

crucial witness against him (i.e., the victim) in violation of art. 12 of the Massachusetts Declaration of Rights and the Sixth and Fourteenth Amendments to the United States Constitution. See *White* v. *Illinois,* 502 U.S. 346, 352-354 (1992); *Idaho* v. *Wright,* 497 U.S. 805, 813-817 (1990); *Ohio* v. *Roberts,* 448 U.S. 56, 63-66 (1980); *Commonwealth* v. *DelValle,* 351 Mass. 489, 491 (1966), *S.C.,* 353 Mass. 684 (1968).

"The broad rule on hearsay evidence interdicts the admission of a statement made out of court which is offered to prove the truth of what it asserted." *Commonwealth* v. *Qualls,* 425 Mass. 163, 167 (1997), quoting *Commonwealth* v. *DelValle, supra.* However, declarations out of court may be admissible to prove the state of mind or intent of a person when it is a material issue. See, e.g., *Commonwealth* v. *Qualls, supra*; *Commonwealth* v. *Cyr,* 425 Mass. 89, 94 (1997); *Commonwealth* v. *Hunter,* 416 Mass. 831, 837 (1994); *Commonwealth* v. *Lowe,* 391 Mass. 97, 105, cert. denied, 469 U.S. 840 (1984); *Commonwealth* v. *Weichell,* 390 Mass. 62, 64, 73-74 (1983); *Commonwealth* v. *Borodine,* 371 Mass. 1, 7-9 (1976), cert. denied, 429 U.S. 1049 (1977). A murder victim's state of mind becomes a material issue if the defendant opens the door by claiming that the death was a suicide or a result of self-defense, that the victim would voluntarily meet with or go someplace with the defendant, or that the defendant was on friendly terms with the victim. See, e.g., *Commonwealth* v. *Borodine, supra* at 7-8, citing *Commonwealth* v. *Trefethen,* 157 Mass. 180, 190-195 (1892), and *Commonwealth* v. *Howard,* 205 Mass. 128, 132 (1910); *Commonwealth* v. *Gilbert,* 366 Mass. 18, 30 (1974). Such evidence is also material to motive, but only if the defendant knew of the victim's state of mind and, most importantly, "would be likely to respond to it." *Commonwealth* v. *Qualls, supra* at 167. See *Commonwealth* v. *Jenner, ante* 163, 165 (1997); *Commonwealth* v. *Cruz,* 424 Mass. 207, 212 (1997); *Commonwealth* v. *Weichell, supra* at 74; *Commonwealth* v. *Borodine, supra* at 8 (defendant's knowledge may be inferred); *Commonwealth* v. *Van Liew,* 14 Mass. App. Ct. 627, 666-667 (1982). However, evidence of a victim's fear of the defendant is not admissible at all to prove motive. See *Commonwealth* v. *Qualls, supra* at 169 (evidence of victim's fear does not shed light on defendant's motive, even if defendant knew of the fear); *Commonwealth* v. *Jenner, supra* (same).

Where evidence of the victim's state of mind is admitted, it may only be used to prove that state of mind, and not to prove the truth of what was stated or that a defendant harbored certain

thoughts or acted in a certain way. Therefore, on the defendant's request, the jury must be given an instruction on the limited use of state of mind evidence. *Commonwealth* v. *Costa,* 354 Mass. 757 (1968).

Evidence of the victim's state of mind can be very prejudicial because, "with the [victim] absent the trier of fact is forced to rely upon the [victim's] memory, truthfulness, perception, and use of language not subject to cross-examination." *DelValle, supra* at 491. Therefore, before admitting such evidence, a judge must exercise discretion and balance the probative value of such evidence against the prejudicial impact it may have on the defendant's case. The more circumstantial the evidence, the more likely it is that such evidence will adversely affect the defendant's case. Cf. *Commonwealth* v. *Hinckley,* 422 Mass. 261, 267 (1996); *Commonwealth* v. *Cokonougher,* 32 Mass. App. Ct. 54, 60 (1992). We now apply these principles to the evidence admitted in this case.

1. *Evidence concerning the victim's fear of the defendant.* There was evidence that the defendant, to explain his presence at the victim's home on the morning of her death, told a police officer that he and the victim got along well and had agreed to meet at her home to write a joint letter to their son at camp. To rebut the defendant's contentions, the Commonwealth presented evidence concerning the victim's fear of the defendant during the months prior to her death, to show that she was afraid of him and would not have voluntarily agreed to meet with him alone in her house. Evidence of the victim's fear came in through testimony of her family, friends, attorney, and psychiatrist. None of the witnesses testified that he or she had actually seen or heard any physical or oral threat by the defendant.

a. *Testimony properly admitted.* A number of statements made by the victim were properly admitted because they rebutted the defendant's contentions that they got along well and that she would have consented to being alone with him in her house. See *Commonwealth* v. *Borodine, supra* at 7; *Commonwealth* v. *Gilbert, supra* at 30; *Commonwealth* v. *DelValle, supra* at 492. The judge was warranted in concluding that the probative value of understanding the victim's state of mind with respect to whether she would have voluntarily met with the defendant in her home outweighed any prejudice these statements may have had on the defendant's case. It is important to point out that none of the following evidence would have been admissible if the defendant had not opened the door by claiming that he and the victim

"were so happy," and that the victim had agreed to meet with him alone in her house.

The victim's brother testified that the victim had told him that "a number of things had occurred which made her very frightened," and that "[s]he would wake up in the middle of the night and [would] occasionally find [the defendant] in the bedroom. He would arrive at the house at strange times unannounced." He also testified that the victim told him that she "feared something was going to happen to her," and when he suggested she obtain a protective order she responded, "I am afraid that if I got a court order I would inflame my husband. I don't want to do anything that will inflame my husband." In a letter the victim wrote to her brother, which was read to the jury, the victim expressed concern about who would get custody of her son John "if something were to happen to me."

The victim's psychiatrist testified that the victim told her she "did not want to be alone with [the defendant]," that "she was afraid of him," and that the victim was "fearful her husband [would] hit her."

The victim's divorce lawyer testified that the victim was very uncomfortable with the defendant's presence in the home, and that he spoke to the victim about getting a restraining order, but she "indicated to me that she didn't want to do that." A letter, which the victim had written to her lawyer and which was introduced in evidence and read to the jury, stated in part, "I am reluctant to have head on confrontations with him over finances. Right now my big concern is I don't want to be [in the house] alone with him."

The victim's sister-in-law testified that the victim "was distressed and sounded frightened" during a telephone conversation after the victim had found a rifle lying across her bed. A friend of the victim also testified that, during the week before her death, the victim told her that she did not want to drive with the defendant unless she was doing the driving. We emphasize that all the evidence that we have summarized would not have been admissible if the defendant had not contended that he and the victim got along well or that she agreed to meet him alone in her house.

b. *Testimony improperly admitted.* It was error for the judge to allow the Commonwealth on redirect examination to question the psychiatrist regarding the victim's concern that something would happen to her that would be made to look like an accident,

because the defendant did not open the door to this line of questioning. See *Commonwealth* v. *Proctor*, 403 Mass. 146, 149-150 (1988); *Commonwealth* v. *Lapointe*, 402 Mass. 321, 325-326 (1988). It was also error for the Commonwealth to refer to this conversation during redirect examination, because it had been explicitly instructed not to by the judge during its direct examination of the witness. The hearsay statement regarding the victim's fear that something would happen to her that would be made to look like an accident had a prejudicial impact on the defendant's case that outweighed any probative value it had on the victim's fear of the defendant.[5] See, e.g., *Commonwealth* v. *Lewin (No. 2)*, 407 Mass. 629, 631-632 (1990); *Commonwealth* v. *LaSota*, 29 Mass. App. Ct. 15, 27 (1990). The Commonwealth claims that the defendant opened this issue up during cross-examination, and that therefore it was entitled to expound on this evidence during redirect examination. We disagree. The psychiatrist's reply to the defendant's question was nonresponsive. In addition, the psychiatrist is a professional, educated person who had been or should have been instructed not to comment on evidence that had been excluded.[6]

2. *Evidence concerning the victim's refusal to reconcile.* In order to prove motive, the Commonwealth introduced evidence that the defendant sought to reconcile with the victim during early 1990, but that the victim refused. Evidence of the alleged attempt to reconcile came in solely through the victim's out-of-court statements to her psychiatrist and family members. This

[5]In *Commonwealth* v. *Qualls*, 425 Mass. 163, 167 (1997), a statement made by the victim that "[the defendant] was back and [the victim] felt like [the defendant] was going to get him this time," should not have been admitted, because the jury would reason that, if the victim feared being killed by the defendant, and was killed, there is a good chance that the defendant killed him. *Id.* at 172-173, quoting *United States* v. *Brown*, 490 F.2d 758, 778-779 (D.C. Cir. 1974). Similarly, in this case a jury could reason that, if the victim feared that the defendant would murder her and make it look like an accident, and she was murdered, and the defendant claimed it was from natural causes, it is probable that the defendant murdered her. Thus, it would be nearly impossible for a jury to use the victim's statement only for its limited purpose of proving the victim's state of mind. See *Commonwealth* v. *Bond*, 17 Mass. App. Ct. 396, 400 (1984), quoting *United States* v. *Brown*, 490 F.2d 758, 765 (D.C. Cir. 1974).

[6]Although the defendant did not move to strike the psychiatrist's improper statement as he could have, he did object to the evidence coming in on redirect examination, arguing that he did not open the door to this evidence. The decision not to move to strike was not unreasonable because such a motion would focus attention on the improper comment.

evidence was improperly admitted under the state of mind excep-
tion, because such evidence would only have been relevant to
motive if there had been admissible evidence that the defendant
had actually made attempts to reconcile. See *Commonwealth* v.
*Zagranski*, 408 Mass. 278, 283 (1990) (state of mind evidence
not admissible to prove facts stated, but only to show declarant's
state of mind); *Commonwealth* v. *Van Liew, supra* at 667 (same).
In *Commonwealth* v. *Borodine*, 371 Mass. 1, 7 (1976), statements
made by the victim that she intended to end the relationship with
the defendant were admitted to show motive, because the defendant
had told at least one witness that he intended to marry the victim.
Here, the evidence was based entirely on statements the victim
made to others, and there was no independent evidence that the
defendant actually wanted to reconcile.[7]

B. *Evidence Regarding the Defendant's Extramarital Affairs.*

For the purpose of proving motive, the Commonwealth
presented evidence that the defendant had engaged in two
extramarital affairs, one sometime in the early 1980's and another
after they had separated in 1989.[8] Although part of the evidence
consisted of letters written by the victim to her brother, there was
ample nonhearsay evidence of the affairs. The question is really
whether the extramarital affairs are relevant to motive under the
facts of this case.

One affair ended approximately eight years before the murder.
The other affair began after the defendant and the victim had
decided to obtain a divorce. The Commonwealth cites *Com-
monwealth* v. *Bonomi*, 335 Mass. 327, 355 (1957), to support its
argument that evidence of the extramarital affairs was probative
of the victim's intent to end the marriage finally and legally. In
that case, evidence of the defendant's extramarital affair was
properly admitted because the affair occurred prior to any discus-
sions of a separation or divorce, *id.* at 343-344, and there was
such abundant evidence of marital troubles, "that [cumulatively,]

---

[7]The victim's psychiatrist testified that in March, 1990, the victim told her
that the defendant was trying to reconcile with her, but that she would not
agree to do so. The victim's brother testified that at a family vacation in early
July, 1990, the victim said that the defendant had attempted reconciliation, but
that she would not agree. According to her brother, the victim stated: "I know
that he doesn't love me. That the only thing he's interested in is protecting his
property. And I don't love him." The victim's sister-in-law testified to the
same effect.

[8]While it is unclear from the record exactly when the affair began, it ap-
pears that it began only after the defendant and the victim agreed to separate.

they could be found likely to produce an easily provoked and violent state of mind on [the defendant's] part." *Id.* at 355. That is not the case here. Therefore, evidence of the defendant's extramarital affairs should not have been admitted.[9]

C. *Evidence of the Rifle Incident.*

The Commonwealth introduced evidence that in late 1989, the victim found a rifle belonging to the defendant on her bed. The purpose of introducing this evidence was to prove the defendant's malicious disposition toward the victim and to rebut the defendant's claim that their separation was amicable. The defendant admitted to having placed a rifle on the victim's bed, but claimed that it was an attempt on his part to gain sympathy from the victim during the settlement negotiations. However, the victim told numerous people, including the defendant,[10] that she perceived the incident as a threat.

We conclude that evidence of the rifle incident was admissible in the judge's discretion, because it was admitted through non-hearsay testimony and it is relevant to show discord between the defendant and the victim in the face of the defendant's claim that he and the victim "were so happy."[11] See *Commonwealth* v. *Haley*, 363 Mass. 513, 524 (1973). Evidence of such prior misconduct is *not* admissible to show the defendant's bad character or propensity to engage in certain conduct, see *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986), and cases cited, but may be admissible, if relevant, for some other purpose. See *Commonwealth* v. *Cyr*, 425 Mass. 89, 95 (1997). As in *Haley, supra* at 524, evidence of the rifle incident may be relevant to show "the intensity of the discord between [the defendant] and [the victim]."

D. *Is the Defendant Entitled to a New Trial?*

Having concluded that some evidence was improperly admitted, we next consider whether the defendant's case was significantly weakened so as to entitle him to a new trial. See *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 512 (1997); *Commonwealth* v. *Qualls, supra* at 170; *Commonwealth* v. *Cyr, supra.* We cannot fairly say that "the jury could not have been

---

[9]If there were evidence that an affair began prior to the defendant and victim's agreement to separate, such evidence would be admissible at the judge's discretion.

[10]The defendant told the trooper who interviewed him after the victim's death that the victim had perceived it as a threat.

[11]The fact that the rifle incident occurred approximately eight months before the victim's death can be pointed out during cross-examination.

influenced by the [erroneously admitted evidence]." *Commonwealth* v. *Qualls, supra,* quoting *Commonwealth* v. *Stone,* 321 Mass. 471, 474 (1947). We conclude that it was error for the Commonwealth to go forward on redirect and expound on the statements made by the psychiatrist regarding the victim's fear that something would happen to her that would be made to look like an accident, because the defendant did not open the door to this issue. See *Proctor, supra; Lapointe, supra.* The statement made by the victim to the psychiatrist was extremely prejudicial, because it could have been seen by the jury as "a prophecy of what might happen to [her]." *Commonwealth* v. *Qualls, supra* at 172, quoting *United States* v. *Day,* 591 F.2d 861, 883 (D.C. Cir. 1978). Therefore allowing the Commonwealth to highlight and expound on this evidence was prejudicial to the defendant's case. See *Proctor, supra.* But see *Lapointe, supra* at 326. In addition, the jurors could infer that the defendant had a powerful motive to murder the victim based on the improperly admitted evidence regarding the victim's refusal to reconcile, which had been introduced solely through the victim's out-of-court statements. Finally, evidence of the defendant's extramarital affairs, where one was very remote in time, and the other began sometime after they agreed to separate, gave the jury reason to believe that the defendant would want the victim dead.[12] Because the remaining evidence was mostly circumstantial, the inadmissible evidence was highly prejudicial to the defendant's case. Therefore, he is entitled to a new trial.

As a note of caution, at retrial, the judge must exercise discretion to ensure that the cumulative effect of the rebuttal evidence does not result in prejudice to the defendant's case. In addition, because a great deal of state of mind evidence may be offered, it would be appropriate for the judge to instruct the jury on the specific purpose for which each state of mind evidence is admitted.

Because the defendant is granted a new trial, we need not reach his remaining issues. The judgment is reversed, the verdict set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*

---

[12]Under different facts, evidence of an extramarital affair may be admissible to show motive in the judge's discretion.