## Commonwealth *vs.* Julius G. Richardson, Jr.

No. 02-P-282.

Bristol. April 4, 2003. - August 27, 2003.

Present: Grasso, Dreben, & Mills, JJ.

*Evidence,* Hearsay, Verbal completeness, State of mind, Relevancy and materiality, Motive, Threat. *Assault by Means of a Dangerous Weapon.*

In a criminal trial where the defendant was charged with assault with a danger-ous weapon (a knife) and three counts of threatening to commit a crime, the judge erred in admitting in evidence, during direct examination of one complainant, a portion of a written statement that the complainant made to the police, in which the complainant stated that he was told by one of the threatened individuals that on a previous day the defendant had threatened to kill that person with a machete, where the hearsay did not rehabilitate the complainant's testimony, and where the out-of-court threats, which had prejudicial impact far in excess of their limited probative value, were not directly heard by the complainant and therefore were inadmissible to show either his state of mind or the defendant's motive [96-102]; this error, combined with the erroneous admission in evidence of the machete, which could not have been the weapon used in the assault charged, required a new trial [102-103].

Complaint received and sworn to in the Fall River Division of the District Court Department on July 9, 2001.

The case was tried before *Deborah A. Dunn,* J.

*William W. Adams* for the defendant.

*Adam T. Narris,* Assistant District Attorney, for the Commonwealth.

Dreben, J. Convicted of assaulting his nephew with a danger-ous weapon — a knife — and three counts of threatening to commit a crime (threats to kill three individuals), the defendant claims that he is entitled to a new trial because of the erroneous admission of two items of evidence. First, he challenges the admission of the second page of a written statement made to the police by his nephew stating that the nephew was told by one

of the threatened individuals that on a previous day the defendant had threatened to kill him with a machete. Second, he claims that the judge should not have, over objection, allowed the machete to be identified and admitted in evidence as it could not have been the weapon used in the assault. We reverse the convictions.

We set forth briefly the testimony of the Commonwealth's witnesses at trial and the circumstances concerning the admission in evidence of the police report and the machete. To the defendant's consternation, Anthony Pressley, the defendant's nephew, and not the defendant, inherited a house in Swansea from the defendant's mother. Despite having lost a court challenge to the devise, the defendant still considered that he had rights in the house and that Pressley owned the property only on paper. On June 19, 2001, the defendant asked Pressley if he could stay at the house for a few days while he looked for an apartment. Pressley nervously agreed, saying the defendant could sleep on the couch in the living room. At that time, Pressley was living in the house with his sister and two friends, Timothy Francis and Matthew Beland.

Rather than moving out after a few days, the defendant, against Pressley's wishes, worked around the house, chopping down trees, trimming bushes, and cutting the grass. He also paid a gas bill, again contrary to Pressley's wishes. During his stay, he did not pay rent, did not have a job, and was not given a key.

On July 5, 2001, Francis, Lee Ogaldez (who was another friend of Pressley), and a teenager from the neighborhood named Mark Botelho were sitting in the living room. The defendant entered and asked Francis when he was moving out. When Francis informed the defendant that he would not move until October, the defendant became angry, stating, "I want the room that you live in and if you don't give it to me, I'm going to have to bust you over the head . . . to get you out of there." Upon hearing the argument, Pressley entered the living room and told the defendant that he could not "kick people out of my house." The defendant then pulled a knife from his pocket, opened it, and put the blade to Pressley's throat. He looked in the direction of Francis and Ogaldez, and said, "Say one more

word and I'll kill you right now and I'll kill everybody else in here so there will be no witnesses at the trial." Nobody moved, and after holding the knife to Pressley's throat for about ten seconds, the defendant, according to Pressley, "went about things like it was normal . . . [and] said, 'I'm sorry, I have to do what I have to do.' "

That afternoon, Pressley first went to a friend's house and then later to the police station. He spoke to an officer for one and one-half hours, but did not file a statement, press charges, or apply for a restraining order. He spent the night at his house, although the defendant was there. Later that night, he discussed the matter with Francis and Ogaldez. Francis also spent the night in Pressley's house.

The next afternoon, Pressley, together with Francis and Ogaldez, went to the police station. They each wrote statements and pressed charges but did not seek a restraining order. After reporting the attack, Ogaldez and Pressley went back to the house and removed items that the defendant could use as a weapon, including a machete. They left to watch for the defendant's return; when he did, they alerted the police, who then came and arrested him. Thereafter Pressley, for the first time, sought and obtained a restraining order.

The evidence as to the machete was as follows. Over the defendant's objection, the machete was marked for identification, and Pressley, Francis, Ogaldez, and a police officer were each permitted to identify the machete. Again over objection, the machete as well as the knife were admitted in evidence.

After the Commonwealth rested,[1] the defendant took the stand and denied assaulting Pressley and denied threatening to kill the people in the room.[2]

1. *Pressley's statement to the police.* On direct examination, Pressley testified that there had been two persons on the living

---

[1]Other prosecution witnesses at trial were Francis (who was only questioned as to the events of July 5), Ogaldez, and a police officer.

[2]The defendant claimed that he had asked Francis about moving. During the conversation Pressley "butted in and said, 'You're a guest here,' right. And I said, 'This is my family's house. Don't say another word to me or I'll kick your ass.' " The defendant also explained that he used the machete to cut bushes.

room couch during the July 5 incident. In an attempt to impeach Pressley's credibility,[3] defense counsel on cross-examination asked him to read the first sentence of a two-page statement he had made to the police on July 6. That sentence was as follows:

> "On the afternoon of July 5th, 2001, [the defendant] threatened to kill me and three of my friends, Mark, Tim, and Lee."

Pressley readily acknowledged that he had made a mistake when testifying and that a teenager, Mark Botelho, had also been present.

On redirect examination, Pressley was asked to read the whole statement. The defendant objected, but the judge overruled the objection, saying, "He can rehabilitate. Go ahead." Thereupon Pressley read the material set forth in the margin, which related to the July 5 incident.[4] (The defendant does not urge error on appeal in its admission.) The prosecutor then asked if there was a second page. Defense counsel asked if he could approach the bench. The judge stated: "Overruled."

Thereupon Pressley read:

> "My friend Tim Francis also told me that on the morning of July 4th, at approximately 2:00 A.M., [the defendant] also threatened to kill him and Matthew Beland and two of his friends, Matthew's friends — I'm sorry — with a machete which he held threateningly towards him when he

---

[3]This may have seemed important to the defense as both Francis and Ogaldez were close friends of Pressley's. Mark Botelho, perhaps a more objective witness, did not testify at trial.

[4]"[The defendant] held a knife to my throat and dared me to speak after a brief argument about the ownership of my house. He told me that no matter what paperwork I had in regards to the ownership of the house, it was his, and if anyone tried to make him leave, he would kill us all, and then kill himself. He threatened to bludgeon my friend Tim Francis to death if he doesn't move out of the house. He threatened us several times in this manner until we finally stopped talking to him. He said he would kill everyone so there would be no witnesses. He also stated that if he were arrested he would be released on bail and return to my home to kill everyone in the house. We have no way of removing him from the property without him trying to take our lives. The residents of my home are too afraid to return until he is safely put behind bars. I know that he sells illegal substances, and I don't want him in or near my home anymore. He may try to burn my home down when he is forced to leave. I know he will try to kill my friends and my sister Nina."

was speaking to him. He, having no authority in my home and without permission, removed the two guests from my house. When told he couldn't do such a thing by Tim, he threatened to kill him and Matt and my two guests."

Defense counsel interjected, "Now I'm going to move for a mistrial, Your Honor. I'd like to be heard." The judge again overruled the motion, stating that she would hear him later.

After discharging the jurors for the day, she permitted defense counsel to speak. Defense counsel referred to a discussion on the record with the judge just before trial. He pointed out that although prior bad acts had been discussed, the incident of July 4 was not part of the discussion[5] and was not part of the indictment. Defense counsel questioned the admissibility of the entire statement and noted, "I don't think you had time to give the jury an instruction as to the non-substantive value of these prior statements." He also asked for a mistrial. The judge denied the mistrial, ruling the statement "admissible on several grounds with regard to rehabilitate, with regard to state of mind of the victim, and with regard to relevancy as it relates to motive and intent."

The Commonwealth claims, citing *Commonwealth* v. *Cancel*, 394 Mass. 567, 570 (1985), and *Commonwealth* v. *Raymond*, 424 Mass. 382, 388 n.5 (1997), that the defendant objected only generally and failed to object specifically on the grounds of hearsay and that, therefore, the hearsay may be given any evi-

---

[5]The Commonwealth, prior to trial, moved to admit the background of the situation relating to the house. In response to the judge's query as to what exactly the Commonwealth wanted to elicit, the prosecutor stated:

"I would ask the victim where he lived, who owns the house, how did he come to own the house, whether or not he had ever had any prior conversation with the defendant about the house, what that conversation entailed, how the defendant came — that on June 19th he knew the defendant had just got out of jail. He knew he was homeless. He knew he had nowhere to live. They had a conversation about the defendant sleeping on the couch for a few weeks. That on July 5th, the day that this happened, there was a further argument about the house. That the defendant said that he would never leave the house, then pulled a knife on the victim."

At that time, prior to trial, the judge ruled, over the defendant's objection, that she would allow the material and would exclude only from the offer of proof the statement about the defendant's incarceration.

dentiary value which it may possess. *Commonwealth* v. *Carmona*, 428 Mass. 268, 271 (1998). Although there were intimations that hearsay was involved,[6] a more explicit objection should probably have been made. We need not decide whether the objection was properly preserved because even were we to assume that the standard of review is whether the admission of Pressley's statement created a substantial risk of a miscarriage of justice, we would require a new trial.

The introduction of the second page of the police report was error. Contrary to the Commonwealth's contention, the rule of verbal completeness does not permit the admission.

> "When a party introduces a portion of a statement or writing in evidence the doctrine of verbal completeness allows admission of other relevant portions of the same statement or writing which serve to 'clarify the context' of the admitted portion. *Commonwealth* v. *Robles*, 423 Mass. 62, 69 (1996). The rule prevents a party from presenting a fragmented and misleading version of events to the finder of fact."

*Commonwealth* v. *Carmona*, 428 Mass. at 272. While a trial judge has discretion in the matter, it is settled that "only those parts of a document which throw light upon the parts already admitted" should be deemed competent. *Commonwealth* v. *Watson*, 377 Mass. 814, 830 (1979). The portion of the statement sought to be introduced must "qualify or explain the segment" previously introduced. *Commonwealth* v. *Leftwich*, 430 Mass. 865, 872 (2000). The second page of Pressley's statement neither qualified nor explained who was present during the incident on July 5, 2001, and, in that sense, did not serve to "rehabilitate" his testimony.

The other grounds relied on by the judge are also inapplicable. Although most of the cases discussing threats of a defendant involve a deceased victim, the reasoning of those opinions also applies here. Introduction of evidence of a victim's declarations of fear or threats by the defendant to show the state

---

[6]As indicated, defense counsel referred to an instruction as to the nonsubstantive nature of the statements, and the Commonwealth, in countering the defendant's objection, discussed the doctrine of completeness which was applicable to hearsay statements.

of mind of the declarant is admissible only if it is relevant to a material issue in the case. As explained in *Commonwealth* v. *Bond*, 17 Mass. App. Ct. 396, 398 (1984), "if a defendant is tried for murder and as part of his defense claims that the deceased committed suicide, evidence is admissible that the victim had made recent statements, either consistent with suicidal intent or inconsistent with that intention" (citations omitted). See *Commonwealth* v. *Magraw*, 426 Mass. 589, 595 (1998) (hearsay statements of victim of fear admissible to rebut defendant's contentions that they got along well and that she would have consented to being alone with him). Here, as in *Bond*, the prosecution also argues that the testimony was admissible because it was relevant to the question of motive and intent, and as in *Bond*, the hearsay evidence consisted of threats by the defendant toward the victim and permitted the inference that the victim feared the defendant. In rejecting the argument that such threats were relevant to motive, we said in *Bond*, at 399-400:

> "None of this evidence was material to any issue in the case. '[E]vidence of threats preceding a crime can properly come only from one who heard or witnessed them.' *Commonwealth* v. *DelValle*, 351 Mass. 489, 495 (1966). The admission of such evidence is highly prejudicial because it tends to show the state of the defendant's mind, not that of the declarant. Thus, 'to hold admissible evidence of threats to a deceased not witnessed by others would in effect permit the introduction of such declarations to prove their truth. Permitting this testimony under the narrow state of mind exception to the hearsay rule is to allow the exception to swallow the rule.' *Id.* at 493."

*Commonwealth* v. *Gil*, 393 Mass. 204, 218 (1984), and *Commonwealth* v. *Andrade*, 422 Mass. 236, 239 (1996), also hold that threats preceding a crime can be introduced only from a witness who heard or witnessed them. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 348 (1998). Had the Commonwealth elicited this evidence directly from Francis, who was a witness at trial, the threats would not have been hearsay, and in the discretion of the judge would have been admissible. *Commonwealth* v. *Seabrooks*, 425 Mass. 507, 512 n.6 (1997). *Commonwealth* v. *Stroyny*, 435 Mass. 635, 642 (2002).

Although some authorities (the modern view) suggest that objections to hearsay no longer are important where the declarant is subject to cross-examination, as was Francis, this does not appear to be the rule in Massachusetts concerning unsworn out-of-court statements not made in the presence of a fact finder. See discussion of the modern and orthodox views of hearsay in *Commonwealth* v. *Daye*, 393 Mass. 55, 66-75 (1984). That case and *Commonwealth* v. *Clements*, 436 Mass. 190, 193 (2002), reflect the caution with which Massachusetts courts treat extrajudicial statements even if given under oath. The Federal rules also take a cautious view, termed by one scholar as "an intermediate position, neither admitting nor rejecting prior statements of witnesses in toto where the 'declarant testifies and is subject to cross-examination concerning the statement,' but exempting from classification as hearsay certain prior statements thought by circumstances to be generally free of the danger of abuse." 2 McCormick, Evidence § 251, at 117 (5th ed. 1999). None of these exemptions apply here,[7] and as we have discussed above, our cases do not consider out-of-court threats not directly heard by a witness admissible to show the victim's state of mind or the defendant's motive in the circumstances here. The uncharged crime, threatening to use a machete against Francis, is a far more egregious event than the charged threat of July 5. Even if the threat could be considered as evidence of the defendant's motive, the evidence of that motive (to stay in the house and remove Francis) was far stronger in the charged incident of July 5. The prejudicial impact of the July 4 threats far exceeded the limited probative value of those threats. Even if the judge had given a limiting instruction,[8] it would have been nearly impossible for a jury to use the statement only for a limited purpose. See *Commonwealth* v. *Magraw*, 426 Mass. at 597 n.5; *Commonwealth* v. *Bond*, 17 Mass.

---

[7]Rule 801(d)(1) of the Federal Rules of Evidence provides that the following statements are exempt: (A) inconsistent statements "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition;" (B) consistent statements "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive;" and (C) statements "of identification."

[8]As indicated earlier, the defendant did not explicitly ask for such an instruction, only noting its absence.

App. Ct. at 399-400. It is also noteworthy that the Commonwealth did not choose to question Francis directly on the matter, perhaps recognizing the difficulty of its admission due to its inherent prejudice.

We have no doubt that the evidence weakened the defendant's case. While acknowledging that there was tension over the house, the defense attempted to persuade the jury that the allegations were fabricated and pointed to the casual manner in which Pressley and his companions treated the threats and assault. Two of them slept in the same house with the defendant that night, and all three waited until the next day in the afternoon to file charges and make statements. While we do not determine that this error in itself creates a substantial risk of a miscarriage of justice, we conclude that the admission of the second page of the statement, together with the erroneous introduction of the machete, see *infra*, require a new trial. See *Commonwealth* v. *Andujar*, 57 Mass. App. Ct. 529, 532 (2003).

2. *Admission of machete.* As previously set forth, the machete was identified (shown to the jury), over objection, by four witnesses — Pressley, Francis, Ogaldez, and a police officer — and was also admitted over objection. This was error, as the machete was not a weapon that could have been used in the assault with which the defendant was charged. "Cases here and elsewhere have not . . . viewed the tenuous relevancy of evidence of a person's general acquaintance with weapons as outweighing the likelihood that such evidence will have an impact on the jury unfair to [the] defendant." *Commonwealth* v. *Toro*, 395 Mass. 354, 358 (1985). See *Commonwealth* v. *O'Toole*, 326 Mass. 35, 39 (1950); *Commonwealth* v. *West*, 357 Mass. 245, 248 (1970); *Commonwealth* v. *Graham*, 431 Mass. 282, 288 (2000). This is particularly true where, as here, the machete could have been viewed by the jury as a more lethal weapon than the knife.[9] In this case we cannot say that we are

---

[9]The jury showed interest in both weapons. After they were charged by the judge, they had what the judge termed as four questions: 1. "Can we see the knife and machete? Can we hold them? Can we touch them?" 2. "Can we have a copy of the statements made to the police?" 3. "Why was Mark not called as a witness?" 4. Can the judge "please repeat the instructions regarding each charge." At that time, the defendant himself said he had no objection to their seeing the machete because "the jury wants to check to see if I was

sure that the error did not influence the jury or had but slight effect, especially in view of the admission of Pressley's statement. See *Commonwealth* v. *Graham*, 431 Mass. at 288. Accordingly, the judgments are reversed, the verdicts are set aside, and the case is remanded to the District Court for a new trial.

*So ordered.*

chopping bushes with it." The judge complied with questions 1 (with a court officer present) and 4.