COMMONWEALTH *vs.* JAMES R. CYR, JR.

Franklin. March 4, 1997. - May 27, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, FRIED, & MARSHALL, JJ.

*Evidence,* Hearsay, State of mind, Relevancy and materiality, Cumulative evidence, Prior misconduct, Expert opinion, Previous testimony of unavailable witness. *Homicide.*

At a murder trial, the judge erred in admitting hearsay statements of the victim as to her fear of the defendant and regarding his other violent bad acts, and where the only issue in the case was the degree of the defendant's culpability the statements were unfairly prejudicial and undermined the defendant's defense, and the admission of the evidence constituted reversible error. [92-95]

At the retrial of a murder case, the trial judge should rule on the admissibility of evidence of the defendant's other misconduct [95-96]; certain Probate Court records should be redacted to exclude hearsay [96]; the medical examiner may properly characterize the wounds suffered by the victim, with appropriate jury instructions by the judge [96-97]; prior recorded testimony of court proceedings in the case may properly be admitted [97]; and if any view of the evidence supported the inference that the victim used excessive force in repelling the defendant, a charge on manslaughter would be appropriate [97-98].

INDICTMENT found and returned in the Superior Court Department on April 6, 1993.

The case was tried before *William H. Welch,* J.

*David P. Hoose (Judith Wideman* with him) for the defendant.

*Judith Ellen Pietras,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. After trial by jury, James R. Cyr, Jr., was convicted of murder in the first degree by reason of deliberate premeditation and of arson.[1] On appeal, the defendant argues that the judge's evidentiary rulings on the victim's state of mind were erroneous. The defendant asserts that the errone-

---

[1]The defendant does not allege any error in the conviction of arson. That conviction is affirmed.

ously admitted evidence was unfairly prejudicial and undermined his defense. Therefore, the defendant concludes a new trial is required on his conviction of murder in the first degree. We agree. We reverse and remand for a new trial on the indictment charging murder.

*Facts.* We summarize the evidence viewed in the light most favorable to the Commonwealth. *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985). Tara Hartnett and the defendant met while attending college at the University of Massachusetts at Amherst. In April, 1992, during her junior year, Hartnett gave birth to the defendant's daughter. During the pregnancy, Hartnett and the defendant had agreed that adoption was in the best interest of the child. They met with a nurse counsellor at Children's Aid and Family Services in Northampton, to plan for the adoption placement. The nurse counsellor met with Hartnett and the defendant several times during the course of the pregnancy and after the child's birth. She said that there was increasing tension and discord in the relationship between Hartnett and the defendant as to the child's future.

After the child was born, the defendant decided that he wanted to keep the child himself with some help from his parents. Hartnett still believed that adoption was in the child's best interest. Eventually, Hartnett and the defendant decided against adoption. They agreed to have the child live at the defendant's parents' home in Amherst. Hartnett could see the child every day and help raise her.

On February 13, 1993, Hartnett and the defendant had a violent altercation which precipitated a series of legal proceedings in the District Court. Each sought a protective order against the other. A hearing on the orders was held in the Northampton Division of the District Court Department. The court issued the orders requested by both parties. A friend of Hartnett was designated the go-between. The go-between's tasks included picking up the child at the defendant's house for visits with Hartnett. Hartnett filed a petition with the Hampshire County Division of the Probate and Family Court, seeking to gain custody of the child. She also filed a criminal complaint against the defendant.

On March 19, 1993, there was a Probate Court hearing. Pending further probate custody proceedings, the child continued to live with the defendant and his parents. On the

evening of March 20, 1993, Sunderland police and fire personnel were summoned to a fire at Hartnett's house. These officials recovered Hartnett's body from the burnt house.

Hartnett's body had several stab wounds and extensive third degree burns. Forensic testing revealed that Hartnett had been stabbed eight times, but was alive at the time of the fire.[2] The police discovered blood in almost every room of the house. They recovered a bloody knife. The police also observed a fresh trail of footprints and blood leading away from the house, and an identical set of footprints, absent the blood, leading toward the house. Next to the footprints leading toward the house, they found an impression in the snow, the dimensions of which matched that of a gasoline can found melted on the floor of the burned home. Hartnett's housemates said that they had never seen the knife in their home.[3]

That same evening, the defendant sought medical treatment at the emergency room of Cooley Dickinson Hospital. His hands were cut and bloody, he smelled of smoke and had singed hair. The defendant told the hospital personnel, and later the police, that he had burned his head on the stove while making coffee and that someone had attacked him with a knife while he was in his car.

The defendant admitted that he and Hartnett often argued and screamed at each other, especially about parenting. The defendant also testified that, on February 13, he and Hartnett got into an escalating argument over the child. They "shoved each other." He then "pushed her away from" him into a closet. He grabbed the telephone out of her hands as she tried to call the police. He refused to let her take the child out because she was too upset.[4]

The defendant said that, on the evening of March 20, he drove to Hartnett's house. To avoid detection and arrest for violation of the protective order, he parked his car on a nearby

[2]The medical examiner opined that Hartnett died primarily of smoke inhalation, with the burn injuries and the loss of blood due to the stab wounds as secondary and tertiary causes of death, respectively.

[3]We do not recite the extensive forensic evidence linking the defendant to the killing as he does not deny killing Tara Hartnett. He only challenges his degree of culpability.

[4]A show cause hearing on Hartnett's criminal complaint took place on March 18, 1993. Three witnesses testified as to Hartnett's testimony regarding the February 13 incident.

road and walked through the woods to Hartnett's house. The defendant said that, although Hartnett tried to close the door on him, he stuck his foot in the door and forced his way into her house. Hartnett ran away from him.

The defendant said that Hartnett grabbed a knife from the kitchen. She cut his hand. The defendant then hit her, knocked her down, grabbed the knife, and "attacked her with it." The knife slipped and he felt his fingers go numb. The defendant said that he realized that he had just partially severed his fingers and that "drove [him] on even more, more." He said that Hartnett tried to run from him, but he followed her from room to room. Hartnett eventually collapsed on the floor, and stopped moving. Thinking she was already dead, the defendant ran from the house.

The defendant said that he was bleeding heavily. As he was running away over snowbanks by the garage, he looked in the open door and saw a can of gasoline.[5] He decided to burn the house because he knew there was blood everywhere. He spilled the gasoline in various rooms and searched the house for matches. He found matches but he had difficulty striking them due to his injured hand. He finally ignited the gasoline. The back of his head was burned as he fled through the breezeway door. He admitted that the blood and footprints leading away from the house were his. However, he denied that the footprints (with the nearby impression matching the dimensions of the gas can) which led to the house were his. He went home and asked his father to bring him to the hospital. He admitted lying to the doctor and the police about how he was injured.

On rebuttal, two police officers testified that, when they arrived at Hartnett's house on the evening of March 20, the garage doors were closed. One officer also testified that he had examined the breezeway door and the snowbanks in front of the garage door, and that he had found no blood or footprints there.

A. *Hearsay.* The defendant asserts that the judge's evidentiary rulings on Hartnett's state of mind were erroneous and prejudicial. He claims that the judge admitted Hartnett's hearsay statements concerning her fear of the defendant and

---

[5]Hartnett's housemates said that they had never seen the gasoline can in the garage.

his prior misconduct. The defendant contends that that hearsay evidence undermined his defense of what he calls provocation or lack of malicious intent.

Generally, a deceased's expressions of fear of the defendant are not relevant to or probative of the defendant's motive. See *Commonwealth* v. *DelValle*, 351 Mass. 489, 493 (1966) (evidence of threats held immaterial as demonstrative "only [of] a state of fear on the part of the deceased," and therefore inadmissible hearsay); *Commonwealth* v. *Williams*, 30 Mass. App. Ct. 543, 548 (1991) (victim's statement that she feared the defendant was inadmissible hearsay); *Commonwealth* v. *Bond*, 17 Mass. App. Ct. 396, 399 (1984) (victim's statements recounting threats by defendant and expressing fear of defendant inadmissible hearsay). The judge, despite this general rule, permitted witnesses to testify as to Hartnett's statements to show the relationship between the parties.[6]

A friend of Hartnett said that Hartnett told her: "[S]he was afraid for [the child's] safety as well as her own because of [the defendant's] personality and his violence." Over defense counsel's objection, the judge ruled that this statement was admissible "to show the relationship that was existing between the parties and what was going on between them, the general tenor of their behavior, one to the other."[7] The nurse counsellor said that, during a telephone conversation, Hartnett had told her: "If [the defendant] would hit his mother and he would hit me, what will he do to [the child] in the future. So I don't want him to raise [the child]."[8] The nurse counsellor said that she told Hartnett that "she had a right to feel safe, and that she had a right to make sure her child was safe." The nurse counsellor also said that, during another telephone conversation, Hartnett told her: "I'm afraid of [the defendant] and I don't want him anywhere near me, and I wouldn't drop the [protective] order."

We conclude that the admission of the extrajudicial hearsay

---

[6]There was ample admissible evidence as to the tension and conflicts in the relationship between Hartnett and the defendant.

[7]Defense counsel did not specifically object to all the hearsay statements. However, the record indicates that the judge was on notice that defense counsel was objecting to the admission of hearsay statements made by Hartnett.

[8]The admission of this statement was egregious because there was no evidence that Hartnett ever saw the defendant strike his mother.

statements of Hartnett as to her fear of the defendant was erroneous and prejudicial. The hearsay statements undermined the defendant's defense. See, e.g., *Commonwealth* v. *Andrade*, 422 Mass. 236, 239 (1996). The hearsay testimony of Hartnett's statements invited the jurors to base their decision on the degree of the defendant's culpability (the only issue in the case) on inadmissible hearsay.[9] See *DelValle, supra* at 492-493; *Bond, supra* at 399.

The Commonwealth argues that the extrajudicial statements were admissible because Hartnett's state of mind was known to the defendant and relevant to his motive for killing her.[10] See *Commonwealth* v. *Lowe*, 391 Mass. 97, 106, cert. denied, 469 U.S. 840 (1984); *Commonwealth* v. *Borodine*, 371 Mass. 1, 7-8 (1976), cert. denied, 429 U.S. 1049 (1977). See also *Bond, supra* at 398 ("[t]he state of mind exception . . . allows the admission of extrajudicial statements to show the state of mind of the declarant if it is relevant to a material issue in the case"). Contrary to the Commonwealth's claim, Hartnett's fear of the defendant was not relevant, particularly where the only issue was the defendant's degree of culpability.

The Commonwealth next argues that the improperly admitted evidence was merely cumulative of other properly admissible evidence, and therefore its admission was nonprejudicial error. See *Andrade, supra* at 241-242; *Lowe, supra.* Evidence of Hartnett's statements about her fear and the defendant's violence toward his mother and perhaps his daughter should not have been admitted because the statements were hearsay. See *DelValle, supra* at 495; *Williams, supra* at 548; *Bond, supra* at 399. There was no other properly admitted evidence on those facts. Accordingly, the erroneously admitted evi-

[9]Over defense counsel's objection, the judge ruled that some of Hartnett's statements were admissible as a "declaration of a deceased person." This ruling was erroneous. General Laws c. 233, § 65, is inapplicable to criminal cases. See *Commonwealth* v. *Mandeville*, 386 Mass. 393, 398 n.3 (1982).

[10]At trial, the Commonwealth proceeded on the theory that the defendant killed Hartnett because of her intent to seek custody of their daughter. Accordingly, extrajudicial statements which recounted the increasing conflict between Hartnett and the defendant as to their daughter and related Hartnett's intent to seek custody were properly admissible under the state of mind exception as relevant evidence of the defendant's motive. See *Commonwealth* v. *Lowe*, 391 Mass. 97, 106 (1984); *Commonwealth* v. *Borodine*, 371 Mass. 1, 8 (1976).

dence was not cumulative of properly admitted evidence. Contrast *Andrade, supra* at 240 (new trial not required where "ample other evidence of threats, acts of physical violence, marital discord, and suspicions of infidelity" rendered "the erroneously admitted evidence cumulative on the points of the defendant's intent and his state of mind").

We consider whether the improper admission of evidence weakened the defendant's case in some significant way so as to require a retrial. See *Commonwealth* v. *Daggett,* 416 Mass. 347, 352 n.5 (1993); *Commonwealth* v. *Schulze,* 389 Mass. 735, 741 (1983). We cannot fairly say that, in considering the defendant's intent and degree of culpability, the jurors primarily relied on properly admitted evidence to make their decision. Contrast *Andrade, supra* at 241.

Evidence of Hartnett's fear of the defendant could have been considered by the jurors in determining the defendant's culpability as well as evidence of his violence toward his mother. We therefore conclude that the erroneous admission of the improper evidence constituted reversible error. See *Commonwealth* v. *Stone,* 321 Mass. 471, 474 (1947) ("[w]hether guilty or innocent, he was entitled to be tried in accordance with law"). "[S]uch doubts as we entertain can only be resolved in favor of the defendant." *Commonwealth* v. *Welcome,* 348 Mass. 68, 70 (1964).

B. *Issues likely to recur at a new trial.* We turn to other issues raised on appeal which may recur on retrial.

1. *Other testimony.* Several lay witnesses properly were permitted to testify as to their observations of the defendant's relationship with Hartnett and with his daughter. See *Commonwealth* v. *Cordle,* 404 Mass. 733, 744 (1989), *S.C.,* 412 Mass. 172 (1992); *Commonwealth* v. *Drew,* 397 Mass. 65, 79 (1986). These witnesses, however, also testified as to the defendant's prior misconduct with Hartnett's aunt, brother, sister, and housemates. "It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing his bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." *Commonwealth* v. *Helfant,* 398 Mass. 214, 224 (1986), and cases cited. "If it is determined that the evidence of other misconduct has probative value, the trial judge in his discretion must decide if such evidence is admissible by

determining whether its probative value outweighs the risk of undue prejudice." *Commonwealth* v. *McClendon*, 39 Mass. App. Ct. 122, 128 (1995). See *Commonwealth* v. *Triplett*, 398 Mass. 561, 562-564 (1986).

2. *The Probate Court file.* Over defense counsel's objection, the Probate Court file concerning Hartnett and the defendant was admitted in evidence. Defense counsel argued that, because of the propensity for exaggeration by complainants and their attorneys, the probative value of the evidence was outweighed by its prejudicial impact. The judge ruled the documents admissible to show the relationship of the parties and the defendant's motive. We agree that some documents are not hearsay and may come in as extrinsic evidence to show the relationship of the parties. Hearsay portions regarding Hartnett's intent to gain custody also are admissible as known by the defendant and relevant to his motive. See *Lowe, supra* at 106; *Borodine, supra* at 7-8. However, the file should be redacted to exclude Hartnett's hearsay statements alleging uncharged domestic violence.

3. *Medical examiner's opinion as to the presence of defensiv wounds.* Over defense counsel's objection, the medical examiner was allowed to testify that, in his opinion, the wounds on Hartnett's arms and hands could be characterized as defensive wounds. The defendant argues that the jurors were equally capable of assessing whether those wounds were defensive in nature, and therefore this characterization fell outside the realm of proper expert testimony and improperly invaded the province of the jury. See *Simon* v. *Solomon*, 385 Mass. 91, 105 (1982); *Commonwealth* v. *Montmeny*, 360 Mass. 526, 528-529 (1971). We conclude that there was no error of law or abuse of discretion in allowing the medical examiner to offer expert testimony as to the presence of defensive wounds. See *Simon, supra* ("expert testimony on matters within the witness's field of expertise is admissible whenever it will aid the jury in reaching a decision, even if the expert's opinion touches on the ultimate issues that the jury must decide"). The medical examiner based his opinion on his specialized training, his extensive experience in having conducted approximately 3,000 autopsies, his knowledge of the circumstances in which Hartnett was killed, and hisobservations during the autopsy of the pattern and location of the various wounds on Hartnett's body. See *Commonwealth*

v. *Gregory*, 17 Mass. App. Ct. 651, 655-656 (1984) (medical examiner's opinion regarding defensive wounds admissible where opinion was based on reliable medical data and plausible assumptions within the expert's professional competence). Moreover, the judge properly instructed the jury that expert opinions were given merely to assist the jury, and that the jury could accept or reject those opinions as they saw fit. See *Commonwealth* v. *Matthews*, 406 Mass. 380, 391 (1990).

4. *Prior recorded testimony*. The judge permitted three witnesses who were friends of Hartnett to recount their memory of the testimony at the prior court hearings.[11] The defendant objected. There was no error. "The exception to the hearsay rule permits the admission of prior recorded testimony 'where the prior testimony was given by a person, now unavailable, in a proceeding addressed to substantially the same issues as in the current proceeding, with reasonable opportunity and similar motivation on the prior occasion for cross-examination of the declarant by the party against whom the testimony is now being offered.' *Commonwealth* v. *Meech*, 380 Mass. 490, 494 (1980)." *Commonwealth* v. *Trigones*, 397 Mass. 633, 638 (1986). See P.J. Liacos, Massachusetts Evidence § 8.7.2, at 461 (6th ed. 1994 & Supp. 1995).

5. *Manslaughter charge*. Over the Commonwealth's objection, the judge charged the jury on manslaughter. However, "[i]t is well established that, if any view of the evidence in a case would permit a finding of manslaughter rather than murder, a manslaughter charge should be given." *Commonwealth* v. *Walden*, 380 Mass. 724, 726 (1980), and cases cited. See *Commonwealth* v. *Schnopps*, 383 Mass. 178, 179 (1981), *S.C.*, 390 Mass. 722 (1984) ("[i]n deciding whether the judge should have charged on manslaughter, we assume the version of the facts most favorable to the defendant").

The defendant maintained that, on the evening of March 20, he was distraught over the entire situation and went to Hartnett's house with the intention of merely talking to her. He wanted to settle their issues outside of court. He stated that he entered the house unarmed and tried to calm Hartnett down by assuring her that he just wanted to talk. He claimed that he lost his self-control only after she swung a knife at him and cut his hand.

[11]The record is not clear whether tape recordings of the proceedings were available.

We have not spoken to whether a person in the defendant's position (a trespasser) is entitled to a manslaughter charge in a trial for the killing of an occupant of a dwelling. An occupant of a dwelling has no duty to retreat from an unlawful intruder. G. L. c. 278, § 8A. However, at common law the degree of force an occupant of a dwelling is entitled to use against an intruder varies with the circumstances of the trespass. See generally 1 W.R. LaFave & A.W. Scott, Jr., Substantive Criminal Law § 5.9 (b), at 669-671 (1986 & Supp. 1997). If any view of the evidence supports the inference that Hartnett used excessive force in repelling the defendant, a charge on manslaughter would be appropriate. Contrast *Walden, supra* at 729. See 2 C. Torcia, Wharton's Criminal Law § 159, at 359 (15th ed. 1994). See also *McCoy* v. *State*, 8 Ark. 451, 455 (1848).

Accordingly, the judgment is reversed, the verdict is set aside, and the case is remanded for a new trial on the indictment charging murder in the first degree based on deliberate premeditation.[12] The arson conviction is affirmed.

*So ordered.*

---

[12]The jury rejected the Commonwealth's claim that the murder was committed with extreme atrocity or cruelty. On retrial, that theory may not be submitted to the jury.