COMMONWEALTH vs. JAMES R. CYR, JR.

Franklin. January 9, 2001. - March 30, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, & SOSMAN, JJ.

*Jury and Jurors. Constitutional Law,* Jury, Confrontation of witnesses. *Practice, Criminal,* Verdict, Argument by prosecutor, Capital case. *Homicide. Evidence,* Hearsay, Motive, State of mind.

At a murder trial, the judge correctly instructed the jury that their verdict must be unanimous and correctly refused the defendant's request that the jury be instructed that they must agree unanimously on the particular act that caused the victim's death and on the particular accompanying mental state. [620-624]

At a murder trial, statements of the victim in her pleadings filed in the Probate Court seeking a restraining order against the defendant were admissible to demonstrate the defendant's motive; in any event, the statements were merely cumulative of other properly admitted evidence. [624-625]

At the second trial of a murder case in which the defendant did not testify but his testimony at the first trial was read to the jury, the prosecutor's reference in closing argument to "uncontradicted" testimony of the "witnesses," in circumstances in which the prior testimony of the defendant contradicted the testimony of the witnesses at trial, did not create a substantial likelihood of a miscarriage of justice, where, in light of the judge's instructions on the point, there was no possibility that the jury could have concluded that the defendant's testimony was of less value than the testimony of the other witnesses. [625-627]

INDICTMENT found and returned in the Superior Court Department on April 6, 1993.

Following review by this court, 425 Mass. 89 (1997), the case was tried before *Bertha D. Josephson,* J.

*James M. Doyle* for the defendant.

*Judith Ellen Pietras,* Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. The defendant, James R. Cyr, Jr., was convicted of murder in the first degree on a theory of deliberate premeditation. The victim was his former girl friend, the mother of his child. On appeal he contends that the trial judge errone-

ously denied his request for a specific unanimity instruction and improperly admitted hearsay evidence in violation of his Federal and State constitutional rights. He also claims that during closing argument the prosecutor improperly mischaracterized the evidence. Finally, he asks that we reduce the degree of guilt pursuant to G. L. c. 278, § 33E. We affirm the judgment, and conclude that there is no basis for granting relief under G. L. c. 278, § 33E.

1. *Background.* Previously, in 1995, the defendant was convicted of murder in the first degree and arson. We reversed his murder conviction, holding that improperly admitted hearsay evidence required a new trial. The arson conviction was affirmed. See *Commonwealth* v. *Cyr,* 425 Mass. 89 (1997). In 1998, the defendant was retried and again convicted of murder in the first degree. We recite the evidence introduced at the second trial in its light most favorable to the Commonwealth.

The victim and the defendant met while they were students at the University of Massachusetts at Amherst. In April, 1992, while still a student, the victim gave birth to a child fathered by the defendant. The victim and the defendant had agreed to place the child for adoption; to that end they met several times with a counsellor at Children's Aid and Family Services in Northampton. The counsellor noted increasing discord between the victim and the defendant concerning their child's future.

After the child was born the defendant wished to raise the child, with the help of his parents. The victim continued to believe that adoption was in the child's best interest, but eventually agreed that she and the defendant would raise the child. The defendant and the child lived at his parents' home in Amherst.

On February 13, 1993, when their child was ten months old, the victim and the defendant had a violent altercation that precipitated legal proceedings in which each sought an abuse protection order against the other. A District Court judge issued protective orders against each, and a friend of the victim was designated to facilitate contact and minimize confrontations between them.

The victim also filed a petition in the Probate and Family Court seeking to gain physical custody of her child, with limited,

supervised visitation by the defendant. A hearing on her petition took place on March 19, 1993. The next evening, on March 20, 1993, Sunderland police and fire personnel responded to a report of a fire at the victim's house where they discovered the victim's body. An autopsy confirmed that she had been stabbed nine times and had suffered extensive third degree burns, including chemical burns caused by gasoline or kerosene. Forensic testing revealed that the victim was still alive at the time of the fire.

There was overwhelming evidence that, in violation of the protective order, the defendant forced his way into the victim's house, bringing with him a knife and a can of gasoline. He attacked the victim and stabbed her repeatedly with a knife as she fled from him. He poured gasoline over her and throughout the house and then set the gasoline on fire. The police recovered a bloody knife in the kitchen. They also identified blood in almost every room of the victim's house, and noted a trail of fresh footprints and blood in the snow, leading away from the house. A trail of identical footprints led to the house, next to which they found an impression in the snow, the dimensions of which matched a gasoline can found melted on the floor of the burned house.[1]

The defendant did not testify at his second trial. His testimony from the first trial was introduced in evidence by the Commonwealth, and read to the jury. His version of events differed in key respects from the other evidence. The defendant had explained that, on the night of the victim's death, he drove to the victim's house and, to avoid detection, parked his automobile on a nearby road and walked through the woods to the victim's house. Although the victim tried to prevent him from entering, he stuck his foot in the door and forced his way into her house. The victim then ran from him, and he pursued her. According to the defendant, the victim grabbed a knife from the kitchen, and scratched the defendant's hand. He then hit her, knocked her down, and grabbed the knife. As she tried to escape, he said, he

---

[1]Both sets of footprints were made by a man's size ten shoe with horizontal jagged lines on the sole. A police officer later examined trash taken from the defendant's apartment complex. The officer discovered a trash bag that contained mail addressed to the defendant's parents and a pair of size ten boots with horizontal lines on the soles, on which the police identified occult blood.

chased the victim from room to room, caught her, and "started attacking her" with the knife. The knife slipped and, when he realized that he had partially severed his own fingers, he said, that "drove [him] on even more." The victim eventually collapsed on the floor and stopped moving. The defendant testified that he thought the victim was dead.

He ran from the house, not stopping to check whether she was breathing or to check her pulse. Bleeding heavily, he ran across the snow, passing the garage that he claimed was open, where he saw a can of gasoline. He testified that he then decided to burn the house because "there was blood everywhere." He returned to the house, pouring gasoline everywhere, and then set it on fire. He admitted that the blood and footprints leading away from the house were his, but denied that the footprints leading to the house, next to the impression that matched the melted gasoline can, were his.

On rebuttal, police officers testified that, when they arrived at the victim's house on the evening of March 20, the garage doors were closed. One officer testified that he had examined the breezeway door and the snowbanks in front on the garage door and found neither blood nor footprints, nor was there any blood on the door or inside the garage. Five of the victim's housemates testified that they were certain that there was no gasoline can in the garage. Four housemates were certain that the knife used to kill the victim was not in the house before the killing; a fifth housemate agreed she was "almost certain" of that fact.

2. *Jury unanimity.* The defendant requested that the jurors be instructed that they "could return a verdict of first degree murder only if they agreed unanimously that the defendant committed first degree murder by stabbing, or agreed unanimously that the defendant committed first degree murder by burning." The judge refused this request. The defendant also requested an instruction on malice to the effect that the jurors reach unanimity in regard to a particular act and a particular accompanying mental state, which the judge also refused to give. The defendant argues that these rulings deprived him of his right to a unanimous jury verdict in violation of his Federal (Fifth and Sixth Amendments to the United States Constitution)

and State (art. 12 of the Massachusetts Declaration of Rights) constitutional rights of due process.

A jury verdict in a criminal trial must be unanimous. *Commonwealth* v. *Hebert*, 379 Mass. 752, 754 (1980), citing *Brunson* v. *Commonwealth*, 369 Mass. 106, 120 (1975). When an indictment charges a single offense, a general verdict of murder in the first degree is properly returnable without special finding of the particular manner in which it was committed. *Commonwealth* v. *Berry*, 420 Mass. 95, 111 (1995), quoting *Commonwealth* v. *Devlin*, 335 Mass. 555, 567-568 (1957).[2] But where a defendant is accused of committing a number of acts, alleged to have occurred at different times or places, each of which could support a conviction, a specific unanimity instruction is required to assure agreement as to which particular act the defendant had committed. See, e.g., *Commonwealth* v. *Conefrey*, 420 Mass. 508, 514 (1995) (specific unanimity instruction required where defendant accused of acts of sexual abuse on divers dates and places). See also *Commonwealth* v. *Keevan*, 400 Mass. 557, 566-567 (1987) ("specific unanimity instruction indicates to the jury that they must be unanimous as to which specific act constitutes the offense charged").[3]

The defendant offers the following theory as to how the jury could have reached a nonunanimous verdict. First, he asserts the jury could have found the stabbing and the burning to be two "distinct acts, taken at different times." He argues that the jury could have believed his testimony and could have found that the stabbing attack was provoked by the victim when she scratched him with a knife and was not preceded by any intent to kill her.[4] Although the victim was still breathing during the fire, he continues, the jury could have found that the defendant

---

[2] In *Commonwealth* v. *Devlin*, 335 Mass. 555, 567-568 (1957), we stated that because "[an] indictment charged only a single offence, a general verdict of murder in the first degree was properly returnable without special finding of the particular manner in which it was committed."

[3] A specific unanimity instruction must also be given when a defendant is charged with murder in the first degree on different theories of culpability, requiring that the jury agree unanimously on the theory of culpability. *Commonwealth* v. *Berry*, 420 Mass. 95, 112 (1995). See *Commonwealth* v. *Plunkett*, 422 Mass. 634, 639-40 (1996).

[4] There was scant, if any, evidence that the victim had provoked the defendant, and any conceivable provocation ended when, by the defendant's

believed the victim was already dead when he set the fire, that his only intent at that time was to destroy the blood, and that he set the fire without any intent to kill.

The common law and our jurisprudence have long rejected similar "mistake-as-to-death" claims by those charged with murder. See W.R. LaFave & A.W. Scott, Criminal Law § 3.11, at 382 (2d ed. 1986), noting that these cases have "been a considerable source of difficulty to courts and commentators." Common to such cases are claims similar to the one made here, that the defendant has engaged in two distinct acts and there is no concurrence between the requisite intent to support a conviction of murder and the particular act that killed the victim.[5] The defendant confuses intent to kill with intent to kill by a particular means, thereby confusing the circumstances in which a specific unanimity instruction is required. There is no requirement that death occur "in a way that the defendant actually anticipated." See W.R. LaFave & A.W. Scott, Criminal Law, *supra* at § 3.12, at 410. Nor is there a requirement that the jurors agree unanimously on the method of the commission of death. Whether the defendant believed the victim was dead after he stabbed her, and whether he saturated her immobilized body with gasoline and set it on fire with the intent of destroying the evidence of his crime (the blood that was "everywhere") and not with the intent to kill her, is not relevant because the chain

own account, the victim fled from him and he chased her through the house before stabbing her. See *Commonwealth* v. *Andrade*, 422 Mass. 236, 238 n.2 (1996) ("On no reasonable view of the evidence could the victim's death be considered voluntary manslaughter based on loss of control provoked by sudden combat"). See also *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 321 (1973), *S.C.*, 391 Mass. 123 (1984) (suggestion that scratches inflicted on defendant by his wife could serve as provocation for ferocious yet "malice-free" attack by defendant with deadly instrument was "extravagant"); *Commonwealth* v. *Zukoski*, 370 Mass. 23, 29, (1976) (victim throwing glass at defendant not reasonable provocation to trigger his kicking her to death, especially because threat from thrown glass had passed).

Despite this paucity of evidence, the defendant requested and received an instruction on provocation and voluntary manslaughter. The jury rejected that theory.

[5]As described by W.R. LaFave & A.W. Scott, Criminal Law § 3.11, at 384 (2d ed. 1986), there is a claimed lack of concurrence "in that the act done with intent to kill [here the stabbing] did not kill and the act which did kill [here the burning] was not done with intent to kill."

of causation of death is unbroken; the stabbing was the proximate cause of death.

To support a verdict of premeditated murder the sole issue for the jury in this case was the defendant's state of mind; they were required to find unanimously (as the judge instructed) that the defendant acted with the intent that his actions kill the victim. *Commonwealth* v. *Judge,* 420 Mass. 433, 441 (1995). They were not required to find unanimously that the defendant killed the victim by a particular method. See *Commonwealth* v. *A Juvenile,* 365 Mass. 421, 440 (1974). The defendant admitted that he stabbed the victim repeatedly; that the victim was immobilized when he left her; and that he returned to the house and set fire to the victim.[6] It is uncontroverted that his acts caused the victim's death. In these circumstances no unanimity instruction was required. As succinctly stated most recently by Justice Scalia, "it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. . . . That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict. When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death . . . while six others believe he left her unconscious and set the fire to kill her." (Citations omitted.) *Schad* v. *Arizona,* 501 U.S. 624, 649-650 (1991) (Scalia, J., concurring).[7] See Smith & Hogan, Criminal Law at 320 (6th ed. 1988) ("An

---

[6]For these purposes we view the evidence from the defendant's perspective. We note, however, that the defendant's testimony that he discovered the gasoline can in the garage and only then returned to the house and set it afire cannot be reconciled with the physical evidence at the scene. All of the physical evidence, and the testimony of five housemates of the victim, pointed to a finding that the defendant brought the gasoline can with him.

[7]Our jurisprudence also mirrors English common law in this respect. See, e.g., *Thabo Meli* v. *Regina,* 1 All E.R. 373 (1954), where there was evidence that the defendants struck the victim over the head and, believing him dead, rolled his body over a cliff to make it appear an accident. *Id.* Medical evidence established that the head injury was not sufficient to cause death and that the victim died of exposure. *Id.* The Privy Council concluded that it was "impossible to divide up what was really one transaction in this way," and it was "much too refined a . . . judgment to say that, because [the defendants] were under a misapprehension at one stage and thought that their guilty purpose

intervening act by the original actor will not break the chain of causation so as to excuse [a person accused of murder], where the intervening act is part of the same transaction; but it is otherwise if the act that causes the actus reus is part of a completely different transaction") as quoted in *Regina* v. *LeBrun*, 4 All E.R. 673, 676 (1991); *Commonwealth* v. *Thatch*, 39 Mass. App. Ct. 904, 905 (1995) ("When a single count is charged and where the spatial and temporal separations between acts are short, that is, where the facts show a continuing course of conduct, rather than a succession of clearly detached incidents, a specific unanimity instruction is not required"). The jury were instructed that their verdict must be unanimous. The defendant was entitled to nothing more.[8]

3. *Hearsay*. The defendant argues that, over his objection, portions of the victim's pleadings filed in the Probate and Family Court custody matter were introduced in evidence in violation of his rights under the confrontation clauses of the Federal and State Constitutions.[9] He asserts that these statements portrayed him as a man "obsessed," and, because the critical issue for the jury to decide was the degree of his culpability, premeditation would seem to the jury "very likely." We consider whether it was error for the judge to admit the statements and, if so, whether the error was harmless beyond a reasonable doubt. *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525

---

had been achieved before in fact it was achieved . . . they are to escape the penalties of the law." *Id.*

[8]The judge also gave clear instructions that the elements of murder in the first degree by reason of deliberate premeditation had to exist in a particular "logical sequence" in order for the jurors to find the defendant guilty. She instructed that there must first be deliberation and premeditation by the defendant. The defendant must next form the resolution, or specific intent to kill. Finally, and only after the first two steps, there must be a killing in pursuance of the resolution. These instructions preclude the error posited by the defendant. See *Commonwealth* v. *Pope*, 406 Mass. 581, 588 (1990).

[9]The defendant objects to the introduction of the following statements made by the victim in her pleadings: (a) "Upon [the child's] birth [the defendant] and I agreed to raise the baby together . . . . [The defendant] was to obtain an apartment . . . . [The defendant] moved in with his parents and never obtained an apartment as agreed." (b) "[The defendant] refuses to give me the telephone number where he and my daughter are living." (c) "[The defendant] has interfered with all of my visits . . . even though we had agreed to have my roommate . . . serve as a go-between to avoid direct confrontations."

U.S. 1007 (1998). See *Commonwealth* v. *Daggett*, 416 Mass. 347, 352 n.5 (1993).

It was permissible for the challenged portions of the victim's pleadings to be admitted as evidence of the defendant's motive to kill. "Statements of a victim of a crime made prior to the event may be admissible in order to prove a motive or relevant state of mind of the defendant, if there is evidence they were communicated to the defendant." P.J. Liacos, Massachusetts Evidence § 8.2.2, at 468 (7th ed. 1999). The challenged statements of the victim, clearly communicated to the defendant, tended to shed light on his motive to kill her: the Commonwealth attempted to show that the defendant killed the victim because they were involved in an acrimonious custody battle, and because he sought sole custody of their child at any cost. In our decision reversing the defendant's first conviction, we referred to the victim's pleadings now at issue and said that "extrajudicial statements which recounted the increasing conflict between the victim and the defendant as to their daughter . . . were properly admissible under the state of mind exception as relevant evidence of the defendant's motive." *Commonwealth* v. *Cyr*, 425 Mass. 89, 94 n.10 (1997).[10] Furthermore, the evidence was cumulative of other properly admitted evidence. Evidence which is cumulative does not "commonly" constitute prejudicial error. *Commonwealth* v. *Martinez*, 431 Mass. 168, 176 (2000). There was no error.

4. *Closing argument.* As we noted earlier, the defendant did not testify during his second trial and was not examined or cross-examined before this jury. Evidence of his testimony given at his first trial was, however, read to the jury and that prior testimony contradicted in several important respects the trial testimony of other witnesses. Nevertheless, during closing argument the prosecutor told the jury on two occasions that the

---

[10]We did direct that when the defendant was retried the Probate and Family Court documents "should be redacted to exclude [the victim's] hearsay statements alleging uncharged domestic violence." *Commonwealth* v. *Cyr*, 425 Mass. 89, 96 (1997). The judge followed our instructions and required that the Commonwealth redact all such statements.

testimony of the trial witnesses was "uncontradicted."[11] The defendant contends that this misstatement of the evidence could have caused the jury to regard the defendant's version of events as "something less than evidence," devaluing his testimony. Defense counsel did not object to these or any other remarks of the prosecutor, and we confine our review to whether a substantial likelihood of a miscarriage of justice has occurred. *Commonwealth* v. *Gunter*, 427 Mass. 259, 265 (1998).

Prosecutors have a duty to "argue the Commonwealth's case . . . in a way that states the evidence clearly and fairly." *Commonwealth* v. *Santiago*, 425 Mass. 491, 494 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). See *Commonwealth* v. *Kozec*, 399 Mass. 514, 516-517 (1987). While the prosecutor did mischaracterize the evidence in this one respect, we are "substantially confident that, if the error had not been made, the jury verdict would have been the same." Cf. *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998).

It appears that neither defense counsel nor the prosecutor described the defendant as a "witness" at his second trial, although both did draw the jury's attention to the defendant's testimony given at his first trial. Both characterized the testimony of others in language such as that of "every witness," or "each of the witnesses."[12] Because both the prosecutor and defense counsel made frequent and pointed references to the defendant's testimony,[13] the jury were not likely to consider it "something-less-than-evidence." Defense counsel's

---

[11]The defendant challenges the following statements of the prosecutor: "Now, what else do we know about this gas can? We have the testimony of — the clear, *uncontradicted*, unequivocal testimony of each of the persons who lived in that house; clear, unequivocal *uncontradicted* that this gas can was never in that garage;" and "You heard the clear, unequivocal, *uncontradicted* testimony *of each of the witnesses in the case*, that the garage door was closed. There is no evidence whatsoever that that garage door was open when that murder occurred" (emphasis added).

[12]For example, during his closing argument, defense counsel noted that, "*every* witness . . . told you the garage doors were closed," before he turned to describe the defendant's version of the events.

[13]For example, immediately after making the first challenged statement, the prosecutor reminded the jury of the defendant's testimony about the gasoline can. After the second contested remark, the prosecutor again referred to the

failure to object to this aspect of the prosecutor's closing suggests that the two challenged comments did not have the impact the defendant now attributes to them. See *Commonwealth* v. *Kozec, supra* at 517-518; *Commonwealth* v. *Toro,* 395 Mass. 354, 360 (1985). The judge instructed the jury that they could consider testimony from a previous hearing "the same as" testimony that was given at trial.[14] The judge further instructed that the jury could consider transcribed testimony "the same as" any testimony "that comes from this witness stand," and the fact that such testimony "was given on a prior occasion does not mean that it's any less worthy than other testimony." In light of these instructions, there is no possibility that the jury could have concluded that the defendant's testimony was of less value than the testimony of other witnesses.

5. *Relief under G. L. c. 278, § 33E.* We have reviewed the entire record and conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, either to order a new trial or reduce the verdict.

*Judgment affirmed.*

---

defendant's claim that he had discovered the gasoline can only when he ran from the house and looked through the open garage door.

[14]There is no merit to the defendant's claim that it "would have been clear to the jury that the judge's instructions on prior testimony could not be taken literally." He notes that, with respect to the witnesses who testified at the second trial, the jury were told to consider "not only what was said, but . . . how it was said"; they were instructed to "consider a witness' manner and demeanor on the witness stand, his or her frankness, lack of frankness, thoughtfulness, candor, intelligence, and memory. . . ." The defendant asserts that, in light of those instructions, the jurors must have understood that they could not evaluate the defendant's transcribed testimony "the same as" live testimony, and therefore the judge's charge actually furthered the likelihood that the jury "devalue[d]" the defendant's prior testimony. This argument underestimates the common sense of the jurors, who surely understood that the judge's instruction (a standard instruction about their prerogative to assess witness credibility) did not mean that live testimony was more valuable or important than the defendant's transcribed testimony.