NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11812

COMMONWEALTH  vs.  FAUSTINO DIAZ, JR.


Hampden.      September 8, 2017. - December 8, 2017.

Present:  Gants, C.J., Lenk, Gaziano, Budd, & Kafker, JJ.


Homicide.  Practice, Criminal, Argument by prosecutor, Capital
    case.  Evidence, Chain of custody.


Indictment found and returned in the Superior Court
Department on February 15, 2013.

The case was tried before Constance M. Sweeney, J.


Andrew S. Crouch for the defendant.
Katherine E. McMahon, Assistant District Attorney, for the
Commonwealth.


GAZIANO, J.  In January, 1991, the victim was found lying

across her bed, with her face covered in blood, at a housing

complex for the elderly in Springfield.  She had been sexually

assaulted and severely beaten.  An autopsy determined that she

had suffered numerous broken bones in her face, sternum, and

ribs, and that she died as a result of blunt force trauma.

Police interviewed individuals who knew the victim and also employees who worked at the complex, including maintenance, nursing, and cleaning staff. The defendant, who was a part-time maintenance worker there, was one of those interviewed. No arrests were made, and no suspect was identified.

In 2012, Springfield police reopened the investigation. They sought to interview men, including the defendant, who had had access to the housing complex and to collect deoxyribonucleic acid (DNA) samples from them. Investigators visited the defendant at his place of employment, and he consented to the taking of a DNA sample. Approximately one month later, test results indicated that the defendant's DNA matched the DNA profile from sperm found in the victim's body. The defendant was arrested and indicted on charges of murder in the first degree and aggravated rape.[1] At trial, the Commonwealth proceeded on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder with aggravated rape as the predicate felony. A Superior Court jury found the defendant guilty of murder in the first degree on all three theories.

On appeal, the defendant argues that the prosecutor

---

[1] Approximately one week before trial, the trial judge dismissed the indictment charging aggravated rape as time barred. See Commonwealth v. Morin, 478 Mass.415, 430-431 (2017).

presented arguments and asked the jury to draw inferences from facts that had been excluded from their consideration; made multiple misstatements of fact in her closing argument; suggested that she had personal knowledge of the case beyond the evidence that had been presented to the jury; argued in a manner designed to appeal to the jury's emotions and inflame the jury; and propounded medical theories based on facts that were not in evidence and were, at best, entirely speculative. The defendant contends that, as a result, a new trial is required. In addition, the defendant maintains that his trial counsel was ineffective for failing to object to the improper statements in the prosecutor's closing. The defendant also asks us to use our extraordinary power under G. L. c. 278, § 33E, to reduce the verdict. For the reasons that follow, we affirm the conviction and decline to exercise our authority to grant relief under G. L. c. 278, § 33E.

1. Facts. We recite the facts the jury could have found, reserving some facts for later discussion of particular issues.

a. Discovery of the victim's body. On Sunday, January 20, 1991, the victim's daughter-in-law went to the victim's apartment because the victim unexpectedly had not attended church services. The daughter-in-law entered the apartment and called for the victim, but received no reply. When she inserted her key in the front door lock, she noticed

that the door felt unlocked.  After looking through the living room, dining room, and kitchen, she also noticed that the back door was ajar, being held open by the deadbolt that was touching the doorjamb.

In the bathroom, she found the victim's purse, wet, in the sink, and a towel in the toilet.  Finally, she found the victim dead in the bedroom.  The victim was lying face up with her head at the foot of the bed; her face was covered in blood, and her head was in a pool of blood on a pillow.  The victim's nightgown had been pushed up above her waist; her lower body was naked and her blood-stained underwear was on the floor near the bed.

Crime scene investigators later found blood on the bathroom wall, and blood spatters on the wall, dresser, and curtains in the bedroom.  They also found evidence of blood in the drains in the kitchen and bathroom sinks, and copious amounts of blood on the victim's face and hands and on the bedding.

An autopsy showed that the victim died of blunt trauma from multiple injuries to her head and chest.  Her nose was dislocated and broken, and seven other bones in her face were broken.  There was bleeding from a head injury under her scalp, as well as injuries to her neck muscles that were not evident externally; part of her larynx had been crushed, and there was blood in her mouth and lungs.  She also had four broken ribs and a broken sternum.  Her ribs had been broken by blunt force

trauma.  There were hemorrhages in her eyes that were consistent with strangulation.

In addition, there was a tear in her vaginal wall caused by blunt force and bleeding in her anal cavity.  The medical examiner[2] took samples from a vaginal swab, an anorectal swab, and a perianal swab for an evidence collection kit.

b.  <u>Initial investigation</u>.  Police found no sign of forced entry into the apartment, and officers conducted the investigation on the theory that either the victim knew her assailant or the assailant had had a key.  They interviewed people who had known the victim and employees at the apartment complex and assisted living center.[3]  The defendant was on the list of employees to be interviewed because he was a part-time maintenance worker at the complex and had specific duties in the victim's building.

On January 21, 1991, officers went to the defendant's house

---

[2] Due to his medical condition, the medical examiner who conducted the autopsy did not testify at trial.  An officer who attended the autopsy testified as to his observations, and the Commonwealth's chief medical examiner testified based on an examination of the autopsy report and photographs taken during the autopsy.

[3] The four separate apartment buildings in the complex were connected by a shared common basement.  The kitchen door of the victim's apartment opened into a hallway, which led to another apartment, the basement, and the back door of the building.  Some members of the security staff, as well as the maintenance supervisor, had been issued master keys to the building and the apartments.  The nursing staff had access to keys that were kept in a locked box in their offices.

and asked him if he would come with them to the police station to assist with their investigation of a death of one of the residents at the apartment complex for the elderly. The defendant agreed to accompany them to the police station and speak with the officers; he was driven there in a police cruiser. When the officers informed the defendant of the victim's death, without having told him the circumstances of that death, the defendant broke down and cried for five minutes. The defendant said that he did not have a master key to the apartment units. The defendant was not a suspect at the time he gave his statement.

A chemist from the State police crime laboratory (crime lab) examined the items from the evidence collection kit and found sperm cells on the vaginal swab, the vaginal smear, the anorectal swab, and the anorectal smear. He did not conduct DNA testing on any of this evidence. In 1991, the crime lab did not conduct any form of DNA testing; at that time, such testing was not commonly conducted in State police laboratories nationwide.[4]

The crime lab began DNA testing in 2001. In 2002, a State police analyst performed DNA testing on the anorectal swab and

_____

[4] In 1991, restriction fragment length polymorphism (RFLP) testing, an early method of DNA testing, was performed by the Federal Bureau of Investigations and some private laboratories. This method of DNA testing required a large sample to create a genetic profile, and required a lengthy period of testing in order to obtain the test results.

developed a DNA profile for the sperm fraction of the sample found on that swab.[5]

c. Reopened investigation. In 2012, the office of the Hampden County district attorney reopened a number of unsolved homicides, including the victim's case. Detectives reviewed the case file and began the renewed investigation by interviewing men who had worked at the victim's apartment complex or who otherwise had been acquainted with her. During the summer and fall of that year, detectives interviewed between eight to twelve men, and obtained DNA samples from them. Because there was no probable cause to seek a warrant to obtain the samples, the officers relied on the men's voluntary agreement to provide a sample.

On November 27, 2012, police spoke with the defendant at his workplace. The interview was conducted in an employee break room where the defendant suggested that they talk. The defendant and the officers sat at one of the tables. The defendant said that he remembered the victim, he remembered that she had been killed, and he had worked at the housing complex for the elderly at that time.

---

[5] At trial, the analyst described how a swab could contain two DNA profiles: a sperm fraction and a nonsperm fraction. A nonsperm fraction is present where a swab picks up the victim's skin cells, which contain DNA. The analyst used differential extraction, a process that relies on the different chemical properties of sperm cells and skin cells, to isolate the DNA from the sperm fraction.

The officers requested that the defendant provide a DNA sample, and presented him with a consent form stating that he agreed voluntarily to provide a sample through a buccal swab, notwithstanding the absence of a court order requiring a sample. Officers told him that they were collecting samples from former employees for comparison purposes. The officers placed the form on the table where the defendant could see it, and then read it aloud to him.[6] Because the defendant was not then a suspect and the interview was voluntary, the defendant was not provided Miranda warnings and the officers did not discuss a right to consult with counsel. After listening to one of the detectives read the form, the defendant consented to providing the DNA sample and signed the waiver form. Detectives obtained a buccal swab and left the defendant's workplace shortly thereafter.[7] The sample was delivered to the crime lab for analysis.

Analysts at the crime lab conducted DNA testing on samples obtained from the defendant and five other men. The defendant's

---

[6] An officer testified that the defendant had a heavy accent, but that he was able to understand what the defendant said. The defendant also appeared to understand the officers.

[7] The defendant moved to suppress the DNA evidence obtained from the buccal swab taken at his workplace. After a hearing, the judge denied the motion, finding that the employee break room was not a coercive setting, in that the door to the room had been open and employees were coming into the room and leaving it during the interview. See Commonwealth v. Groome, 435 Mass. 201, 212 (2001). The judge found that the defendant voluntarily provided the police with a DNA sample.

DNA matched the DNA profile of sperm found on both the perianal swab and the anorectal swab. Statistical analysis, introduced at trial by a different State police chemist, established that the likelihood a DNA profile would match a randomly selected individual was 1 in 2.064 quadrillion in the Hispanic population, 1 in 1.531 quadrillion in the Caucasian population, 1 in 87.11 quadrillion in the African American population, and 1 in 61.58 quadrillion in the Asian population. Police arrested the defendant on January 21, 2013.

The investigating officers interviewed the assistant administrator for the complex, and also reinterviewed the man who had been the complex's maintenance supervisor at the time of the victim's death. Each of them told police, for the first time, that when the defendant returned to work, as scheduled, a few days after the victim's death, he was not wearing the green army fatigue jacket and work boots that he usually wore to work. Instead, he wore a sport coat and shoes. The defendant worked for approximately a month after the victim's death, and then did not return. During that month, he did not wear the green army jacket or the work boots.

The complex's maintenance supervisor also told police during this later interview that, approximately one month before the victim's death, the supervisor told the defendant to stop asking residents for money, and offered to lend the defendant

money for the Christmas holiday.  When the supervisor confronted the defendant, he agreed that he had been asking residents for money, said that he would stop doing so, and accepted the supervisor's offer of a loan.

2.  Discussion.  In this appeal, the defendant challenges several statements by the prosecutor during her closing argument.  He contends that the statements misstated the facts; made improper inferences based on facts not in evidence; suggested that the prosecutor had personal knowledge of the case beyond the evidence that had been presented to the jury; improperly sought to inflame the jury's emotions and distract them from making a reasoned determination based on the evidence; and urged the jury to draw speculative inferences about the defendant's background, in an effort to prejudice the jury against him, without any basis in the evidence.  The defendant maintains that these statements, and his trial counsel's failure to object to them, require that he be granted a new trial.

"When a defendant raises a claim of error regarding a prosecutor's closing argument, we consider (1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's

conclusions."  Commonwealth v. Kater, 432 Mass. 404, 422-423 (2000), citing Commonwealth v. Kozec, 399 Mass. 514, 518 (1987).

While prosecutors are entitled to argue "forcefully for the defendant's conviction," closing arguments must be limited to the facts in evidence and the reasonable inferences that may be drawn therefrom.  Commonwealth v. Wilson, 427 Mass. 336, 350 (1998).  Within this framework, however, a prosecutor may attempt to "fit all the pieces of evidence together" by suggesting "what conclusions the jury should draw from the evidence" (citation omitted).  Commonwealth v. Burgess, 450 Mass. 422, 437 (2008).  Because the defendant did not object to any of the challenged statements at trial, we consider his arguments to determine whether there was error and, if so, whether it created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Mello, 420 Mass. 375, 379-380 (1995).[8]

a.  Defendant's reaction to news of victim's death.  The defendant argues that the prosecutor relied on facts not in evidence in describing the defendant's reaction in 1991 when the investigating officers informed him of the victim's death:

---

[8] The defendant argues that his counsel was ineffective for failing to object to portions of the prosecutor's closing argument.  This claim is reviewed under the substantial likelihood of a miscarriage of justice standard, which is more favorable to the defendant than the standard for ineffective assistance of counsel in other types of cases.  See Commonwealth v. Painten, 429 Mass. 536, 549-550 (1999), and cases cited; Commonwealth v. Wright, 411 Mass. 678, 681-682 & n.1 (1992).

"Is it a coincidence that in this case when the police talked to him in 1991 about this case, the defendant cries uncontrollably? [A detective] described it extremely emotional, over the top. Was this a coincidence? [The detective] hadn't even told him how [the victim] had died. No other witnesses cried like this. He hadn't even told him how [the victim] had died.

"He hadn't told him that she had been beaten to death and that she had been raped, that [the ninety]-year-old [victim], [four] feet [ten] inches and 110 pounds, that she had beaten to death and raped. But yet, yet, the defendant cries uncontrollably. Ask yourself why and what conclusions you can draw from that evidence.

"I would suggest it's because the defendant didn't need to be told what had happened to [the victim], he knew. He knew what he had done on January 19th of 1991. He knew. He knew that he had beaten her to death and he knew that he had killed her, and he was scared that he was going to get caught."

As the defendant points out, the trial judge sustained an objection to part of the detective's testimony:

The prosecutor: "And you indicated, and it's written in the statement, that the defendant became upset and began to cry?"

The detective: "That's correct."

The prosecutor: "Could you describe what this was like?"

The detective: "It was -- he -- to me, he was over the top on the way he started crying. It was -- he was extremely emotional. Something I had not experienced before from similar witnesses in a case."

Defense counsel: "Objection, Your Honor."

The judge: "Sustained as to that observation."

The defendant's objection was sustained only as to the detective's comparison of the defendant's reaction to that of

similar witnesses. Had the judge sustained the objection as to the entire answer, she would not have limited her decision "to that observation." The detective's statements that the defendant "was extremely emotional" and "was over the top on the way he started crying" were not excluded. The detective's testimony thus supports the prosecutor's statement in closing that the defendant's reaction to the news of the victim's death was "extremely emotional, over the top."

Further, on redirect, the prosecutor asked the detective, "[I]n regards to the defendant breaking down and crying when you were interviewing him, how many other witnesses did that that you interviewed?" The detective responded, "None." The defendant did not object. This testimony supports the prosecutor's statement that "[n]o other witnesses cried like [the defendant]."

The defendant also argues that the prosecutor's statement that the detective "hadn't even told him how [the victim] had died" before the defendant's emotional reaction is inaccurate; at that point, the officer indeed had told the defendant that the victim had been killed. The officer did testify that he informed the defendant that the victim had been killed. He testified also, in response to a question from the prosecutor about whether the officer had mentioned "the manner in which [the victim] had been murdered" or "the manner in which she was

found," that he provided the defendant with "[n]o details" about the victim's death. Thus, the prosecutor's statement that the officers had not told the defendant "how" the victim died before the defendant began crying was a reasonable interpretation of the detective's testimony.

b. <u>Speculation about defendant's motive</u>. The defendant contends also that a new trial is required as a result of the prosecutor's speculation about his motive for the killing:

> "You can ask yourself why, why would someone do something like this? I don't know why. . . . Did he have a drug problem? I don't know. The medicine cabinet was open and left open in her bathroom."

There was evidence that, when the victim was found, the door of the medicine cabinet in the bathroom had been partially open, and her purse had been upended in the bathroom sink. As the defendant points out, however, no evidence was introduced that suggested the defendant used drugs or had any issues with substance abuse. This speculation on the defendant's possible motive for the offense was thus improper, and should not have been made. Moreover, the speculative suggestion, without evidentiary support, went to an issue that, while not an element of the offense, might have been a significant question in the minds of the jury: what would have motivated such a brutal attack on a ninety year old woman who stood less than five feet tall.

Nonetheless, the prosecutor did clarify that she was speculating in making this statement, commenting at the beginning of these musings, "I don't know why [the defendant would have done this]" and ending by repeating, "I don't know." The prosecutor also explained, accurately, that motive "[is] not an element that the Commonwealth has to prove. The Commonwealth doesn't have to prove why." See Commonwealth v. Bois, 476 Mass. 15, 33 (2016). In the circumstances here, given the strength of the Commonwealth's evidence, and the brief and passing nature of these statements, the improper speculative remarks would have had but little, if any, effect on the jury's thinking.

c. Inferences to be drawn from victim's injuries. The defendant contends that the prosecutor also misstated the evidence in presenting her argument in support of the Commonwealth's theory that the manner of the victim's death was extremely atrocious or cruel. The prosecutor told the jury that the victim "didn't die from the first blow . . . . [H]ow else would you explain blood on the palms of her hands and bruising on the back of her hands, on her fingers. . . . [The victim] was alive. She suffered. She was trying to protect herself, covering her bleeding head as the defendant struck her repeatedly, bruising her hands as she covered her head."

While the jury could have found, based on the medical evidence, that the victim had been killed by the first blow to

her head, as the defendant argues, the medical evidence amply supports the prosecutor's assertions that the victim was alive after repeated blows, and would have suffered from her numerous injuries. On cross-examination, the medical examiner testified that one blow to the head of a ninety year old woman could result in immediate death. The medical examiner also testified, however, that in his opinion, the cause of the victim's death was "multiple blunt trauma" to the "head and chest." He further testified that there was physical evidence consistent with "aspirating the blood that was in the pharynx," which meant that the victim would have been alive and struggling to breathe after the attempt at strangulation or after the multiple blows to her face. The medical examiner also testified that the victim's broken bones, displaced nose, and other injuries would have been painful.

"Remarks made during closing arguments are considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury." Commonwealth v. Whitman, 453 Mass. 331, 343 (2009). The defendant is correct that the evidence here did not establish definitively at what point during the attack the victim died. One of the reasonable inferences to be drawn from the evidence, however, was that the victim was not killed by a single blow, and suffered during the brutal attack. Indeed, the medical examiner was inclined to

that belief.  Therefore, this portion of the prosecutor's statement was not improper.  See Commonwealth v. Andrade, 468 Mass. 543, 552 (2014) ("[T]he prosecutor did not misstate the medical examiner's testimony.  Rather, he . . . asked the jury to draw an inference [based on all of the evidence]").

The defendant also challenges the prosecutor's statement in closing that the victim fought to defend herself and had been trying to protect her head with her hands when her hands were bruised.  The defendant argues that the Commonwealth presented no evidence from which the jury could determine that the bruises on the back of the victim's hands were defensive wounds.  As the defendant asserts, the Commonwealth did not introduce any expert testimony to support this theory.  See Commonwealth v. Cyr, 425 Mass. 89, 96-97 (1997) (medical expert may testify that injuries were defensive wounds).  The defendant notes that there were no other injuries to the victim's hands and arms, such as scratches, cuts, or abrasions, and no biological material was found under her fingernails.  Nonetheless, the nature of the assault and the number of blows inflicted on the victim could have supported an inference that she bruised her hands in some manner attempting to ward off her attacker.  To the extent that the evidence did not allow the prosecutor to argue that the victim sustained these wounds "as she covered her head," the brief comments did not create a substantial likelihood of a

miscarriage of justice, given the overwhelming evidence of the brutality of the attack against a particularly vulnerable victim.

d. Suggestion that the defendant disposed of blood evidence. The defendant claims also that the prosecutor's suggestion that the defendant needed to remove blood from his person before leaving the apartment, or that he had gotten blood on his clothes, was improper. The prosecutor's suggestions to this effect, however, were inferences the jury properly could have drawn from the blood spatter on the walls, the curtains, and the furniture in the bedroom; the blood on the wall in the bathroom; the victim's wet purse in the sink; the towel found in the toilet; the evidence of blood in the drains in the bathroom and kitchen sinks; and the testimony that, after the victim's death, the defendant never wore the jacket and work boots to work that he previously had worn routinely.

e. Relief pursuant to G. L. c. 278, § 33E. At trial, the defendant argued that certain items of physical evidence had been mishandled and some pieces of evidence had been lost, thus giving rise to reasonable doubt about his guilt. Although the defendant did not raise any arguments on appeal concerning the handling of the evidence, because the record does indicate issues with respect to specific items, we consider these issues as part of our duty pursuant to G. L. c. 278, § 33E.

The crime lab analyst who tested the anorectal swab in 2002 testified that, in February, 2003, she wrote a note that "[t]he original case file cannot be located at this time." The "original file" referred to the forms presented when the sample was submitted to the crime lab in 1991. The anorectal swab itself was not lost; the crime lab returned the sample to the Springfield police in 1995, and the Springfield police resubmitted the sample to the crime lab in 2001.[9] "Alleged defects in the chain of custody usually go to the weight of the evidence and not its admissibility." Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 230 (1992). Where the judge allowed the defendant to argue that "the Commonwealth has not proven this case, has not connected the dots" because of the assertedly defective chain of custody, there was no error. See id. at 230-231.

We have carefully reviewed the entire record, pursuant to our duty under G. L. c. 278, § 33E, and discern no reason to set

---

[9] Similarly, the defendant argued in his closing that other physical evidence was "lost" because it had been found in the Springfield police department evidence room the week before trial. An officer testified that Springfield police believed they had produced all of the evidence, only to discover an additional box that had the case label on a side that had not initially been visible to them. At trial, the defendant made use of this situation to argue to the jury that the evidence had been lost, notwithstanding that the defendant had received information about the evidence a week prior to trial, and, on appeal, does not make any claim of prejudice from the late disclosure. Accordingly, there is no error. See Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 230-31 (1992).

aside the verdict or to reduce the degree of guilt.

<u>Judgment affirmed</u>.